

**U.S. Department of Justice**

**Leah B. Foley**
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 18, 2025

Roger Burlingame, Esq.
Dechert LLP
Three Bryant Park, 1095 Avenue of the Americas
New York, New York 10036

      Re:    United States v. Gotbit Consulting LLC et al.
              Criminal No. 24-10190-AK

Dear Attorney Burlingame:

The United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, Gotbit Consulting LLC ("Gotbit" or "Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure ("Rule") 11(c)(1)(C):

    1.    <u>Change of Plea</u>

As early as practicable, Defendant will plead guilty to the Superseding Indictment in the above matter, which charges conspiracy to commit market manipulation and wire fraud, in violation of 18 U.S.C. § 371 (Count One), and wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two and Three). Defendant admits that Defendant committed the crimes specified in these counts and is in fact guilty of each one. Defendant agrees that venue for each charge in the Superseding Indictment is proper in the District of Massachusetts. Defendant also knowingly waives any applicable statute of limitations and any legal or procedural defects in the Superseding Indictment.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties:

    a)  On Count One, conspiracy to commit market manipulation and wire fraud, a fine of $500,000 or twice the pecuniary gain or loss from the offense, whichever is greater; a term of probation of not more than five years; a mandatory special assessment of $400; restitution; and forfeiture.

b) On Counts Two and Three, wire fraud, a fine of $500,000 or twice the pecuniary gain or loss from the offense, whichever is greater; a term of probation of not more than five years; a mandatory special assessment of $400; restitution; and forfeiture.

3.    Rule 11(c)(1)(C) Plea

In accordance with Rule 11(c)(1)(C), if the Court accepts this Plea Agreement, the Court must include the agreed disposition in the judgment. If the Court rejects any part of this Plea Agreement, the U.S. Attorney may void the agreement and/or Defendant may withdraw from it. Defendant may not withdraw Defendant's plea for any other reason.

Should the U.S. Attorney void the agreement and/or Defendant move to withdraw Defendant's guilty plea, Defendant agrees to waive any defenses based upon statute of limitations, the constitutional protection against pre-indictment delay, and the Speedy Trial Act for all charges that could have been brought as of the date of this Plea Agreement.

4.    Sentencing Guidelines

The parties agree that Counts 1, 2, and 3 group for purposes of calculating Defendant's sentence under the United States Sentencing Guidelines ("USSG"), and that Defendant's offense level is calculated as follows:

a) Defendant's offense level is calculated under USSG § 8C2.3(a) by reference to USSG § 2B1.1:

   i. Defendant's base offense level is 7, because Defendant's convictions on Counts Two and Three carry a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

   ii. Defendant's offense level is increased by 2, because the offenses involved 10 or more victims (USSG § 2B1.1(b)(2)(A)(i)); and

   iii. Defendant's offense level is increased by 2, because a substantial part of a fraudulent scheme was committed from outside the United States, and the offenses otherwise involved sophisticated means and Defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG § 2B1.1(b)(10)(B), (C)).

b) Defendant's culpability score is 6:

   i. Defendant's score starts with 5 points (USSG § 8C2.5(a));

2

ii. Defendant's score is increased by 2 points, because Defendant had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offenses (USSG § 8C2.5(b)(4)); and

iii. Defendant's score is decreased by 1, because Defendant clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct (USSG § 8C2.5(g)(3)).

c) The term of probation is at least one year but not more than five years (USSG § 8D1.2(a)(1)).

The parties agree that the fraudulent scheme caused loss as defined under USSG § 2B1.1(b)(1). Specifically, the scheme caused reasonably foreseeable pecuniary harm to dispersed market participants who purchased cryptocurrencies at fraudulently inflated prices and lost money after those prices later dropped, once the prices of those cryptocurrencies were no longer artificially inflated. However, neither these losses nor the gain that resulted from the offense can reasonably be estimated based on available information for the purpose of applying an increase to Defendant's offense level under USSG § 2B1.1(b)(1). See App. Note 3(C).

Defendant understands that the Court is not required to follow this calculation. Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility, and may be released from the parties' agreed-upon disposition in Paragraph 5 if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crimes to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

5. <u>Agreed Disposition</u>

The parties agree on the following sentence:

a) No fine, in light of the forfeiture agreed upon by the Defendant and the U.S. Attorney in Paragraph 7 and the monetary relief agreed upon by Defendant and the U.S. Securities and Exchange Commission ("SEC") in Case No. 24-cv-12589-AK ("the SEC Proceeding");

b) forfeiture as set forth in Paragraph 7;

c) 5 years of probation as set forth in Paragraph 8; and

3

d)  mandatory special assessments totaling $1,200, which Defendant must pay to the Clerk of the Court by the date of sentencing.

Defendant agrees that all criminal monetary penalties, including special assessment, forfeiture, and/or fine imposed shall be due and payable immediately, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

The agreed disposition takes into account, among other things, Defendant's agreement to cease, immediately and permanently, to exist or operate; Defendant's agreement to the proposed Consent Judgment in the SEC Proceeding; and Defendant's agreement to forfeit approximately $23 million in cryptocurrency.

6.       Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a)  Defendant will not challenge Defendant's conviction on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b)  Defendant will not challenge Defendant's sentence, including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

The U.S. Attorney agrees not to appeal the imposition of the sentence agreed to by the parties in paragraph 5.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.

Defendant is agreeing to give up these rights in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

     7.     <u>Forfeiture</u>

Defendant understands that the Court has the authority, upon acceptance of Defendant's guilty plea, to enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

Defendant also understands that the U.S. Attorney will file a civil forfeiture action against the following property in the United States Court for the District of Massachusetts:

    a.    All Tether ("USDT"), with a value of approximately $9,016,612, stored in or accessible in the cryptocurrency wallet with address 0x290B6eBbdca04eE984fB8617E1b92deea23052E3;

    b.    All Circle ("USDC"), with a value of approximately $4,177,063, stored in or accessible in the cryptocurrency wallet with address 0x290B6eBbdca04eE984fB8617E1b92deea23052E3;

    c.    All USDT, with a value of approximately $4,975,000, stored in or accessible in the cryptocurrency wallet with address 0xB937Ba9358D20EFcDB5F0fD363Ca963989A536ec; and

    d.    All USDT, with a value of approximately $4,725,000, stored in or accessible in the cryptocurrency wallet with address 0x64b9de4EDE0D4d8C0155c5F1899aA727D539F258.

**Defendant acknowledges that these assets are also listed for forfeiture in the plea agreement of Aleksei Andriunin, Defendant's sole member, and that these assets belong to the Defendant and are solely controlled by Andriunin on Defendant's behalf.**

Defendant admits that these assets are subject to forfeiture because they (1) constitute, or are derived from, proceeds of Defendant's offenses and/or (2) were involved in a transaction or attempted transaction in violation of one or more specified statutory offenses. Defendant agrees that it would be impracticable to separate the portion of the above assets directly traceable to proceeds of the criminal offenses alone for forfeiture in the criminal case and therefore, in lieu of criminal forfeiture, consents to civil forfeiture of the above assets.

Defendant agrees to waive service of the civil forfeiture complaint, to consent to venue in the District of Massachusetts, to consent to the entry of all orders of forfeiture for the above assets in the civil forfeiture case, and to refrain from filing a claim or otherwise contest the civil forfeiture of the above assets.

Defendant agrees to assist fully in the forfeiture of the above assets.  Defendant agrees to promptly take all steps necessary to pass clear title to the above assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. Defendant further agrees (a) not to assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding, and (b) to testify truthfully in any such proceeding.

Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

8.     Probation

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, order the following conditions of probation for a period of five years, in addition to any mandatory conditions of probation:

   a)  The Defendant shall cease to exist or operate.

The parties agree that these conditions are applicable pursuant to USSG §§ 8D1.1(a)(6)-(8) and consistent with USSG § 8B1.2.

9.     Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

10.     Breach of Plea Agreement

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

11.     Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

12.     Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

*       *       *

7

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney David M. Holcomb.

Sincerely,

LEAH B. FOLEY
United States Attorney

By: _____

SETH B. KOSTO
Chief
Securities, Financial & Cyber Fraud Unit

KRISS BASIL
Deputy Chief
Securities, Financial & Cyber Fraud Unit

_____

DAVID M. HOLCOMB
CHRISTOPHER J. MARKHAM
Assistant U.S. Attorneys

8

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I, Aleksei Andriunin, the sole member, Chief Executive Officer, and duly authorized representative of Gotbit Consulting LLC ("Gotbit"), hereby expressly acknowledge the following: (1) that I have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Superseding Indictment and Agreed-Upon Statement of Facts in Exhibit A; (2) that Gotbit has had an opportunity to discuss this Agreement fully and freely with its counsel; (3) that Gotbit fully and completely understands each and every one of the terms of this Agreement; (4) that Gotbit is fully satisfied with the advice and representation provided to it by its counsel; (5) that I am authorized on behalf of Gotbit to enter into this Agreement and to take all such actions as may be necessary to effectual this Agreement; (6) that Gotbit has signed this Agreement knowingly and voluntarily; and (7) no additional promises or representations have been made to Gotbit by any officials of the United States in connection with this matter.

GOTBIT CONSULTING LLC
Defendant
By: Aleksei Andriunin
Authorized Representative

Date: 3\19\25

## ACKNOWLEDGEMENT BY COUNSEL

I, Roger Burlingame, an attorney representing Gotbit Consulting LLC, hereby expressly acknowledge the following: (1) that I have reviewed and discussed this Agreement with my client; (2) that I have explained fully each one of the terms of the Agreement to my client; (3) that I have answered fully each and every question put to me by my client regarding the Agreement; and (4) that I believe my client fully and completely understands all of the Agreement's terms.

ROGER BURLINGAME, ESQ.
Attorney for Gotbit Consulting LLC

Date: 3\19\25

9

**Exhibit A**
(Agreed-Upon Statement of Facts)

Pursuant to the plea agreement in *United States v. Gotbit Consulting LLC et al.*, Case No. 24-cr-10190, Defendant GOTBIT CONSULTING LLC ("GOTBIT") and the United States Attorney for the District of Massachusetts (the "U.S. Attorney") agree to the following statement of facts.

1.      GOTBIT was a company registered in Belize.

2.      GOTBIT had a public website ("https://gotbit.io/") on which it offered "market making" services for cryptocurrencies, such as the active monitoring of cryptocurrency trading and price fluctuations, trading in cryptocurrencies to capitalize on price fluctuations, and related consulting services.

3.      GOTBIT's website advertised, as "Our Friends," the names of various cryptocurrency trading platforms and firms:



4.      GOTBIT's website also declared that GOTBIT had $1.3 billion in assets under management and over 400 clients:



/ GOTBIT HEDGE FUND IN NUMBERS

**1.3B** Assets under management
Funds managed by Gotbit and provided by our Market-Making clients, investors, and VCs

**400+** Live Institutional clients
Mostly Founders of web3 startups, VCs GPs and LPs, Family offices

5.    GOTBIT had more than 180 employees, all of whom were located outside the United States. Those employees included, for example:

a.    ALEKSEI ANDRIUNIN, also known as "Alex Andryunin" ("ANDRIUNIN"), who lived in Russia and Portugal and was the Founder and Chief Executive Officer of GOTBIT;

b.    FEDOR KEDROV ("KEDROV"), who lived in Russia and was GOTBIT's Director of Market Making; and

c.    QAWI JALILI, also known as "Kavi JLL" ("JALILI"), who lived in Russia and was GOTBIT's Director of Sales.

6.    ANDRIUNIN gave interviews promoting GOTBIT, including a 2019 interview posted on YouTube in which ANDRIUNIN described how he started GOTBIT after developing a "trading system" to artificially inflate trading volume for cryptocurrencies with the purpose of getting those cryptocurrencies listed on CoinMarketCap (a website that published a list of "trending" cryptocurrencies) and trading on larger cryptocurrency exchanges. ANDRIUNIN explained that he created an algorithm that inflated trading volume by entering a buy order from

2

one account while simultaneously entering a sell order from another account, thus describing how wash trades deceptively created the appearance of increased trading activity. ANDRIUNIN described how GOTBIT used multiple accounts to create fake trading volume while avoiding detection.

7.    ANDRIUNIN also used his social media presence to promote GOTBIT, recruit GOTBIT employees, and advertise to prospective GOTBIT clients.

8.    GOTBIT and its employees advertised services for "crafting and executing a tailored growth strategy" for clients' tokens with the primary goal of "generat[ing] buy pressure":



/ GOTBIT HEDGE FUND IS
BEYOND CRYPTO MARKET

By harnessing the collective success stories of our clients, the Gotbit Hedge Fund team is committed to crafting and executing a tailored growth strategy for your token. Our primary goal is to generate buy pressure within your market. Founders decide to leverage it for price appreciation or profit generation.

Our vision is entirely based on the belief that market-making solves the primary pain of Web3 founders, which is funding their team & operations after TGE. Therefore our trading desk and AI-powered Software generate profit for our customers and allow them to build the best crypto products that'll someday change the world.

No matter where you are in the process, from launching to coordinated market-making across an infinite number of exchanges, Gotbit Hedge Fund will be your best partner.

GET GROWTH STRATEGY ↗

9.    Privately, GOTBIT offered clients an illegal market manipulation service.

10.    GOTBIT's "market making agreements" with clients listed services that included a "trading volume system … in order to fulfill the minimum trading volume requirements of the [cryptocurrency] exchanges" and "price and market management system and trading volume":

3

1.2    The Market Maker will specifically provide Client with the following services (the "**Services**"):

    1.2.1    trading volume system and liquidity system on the Exchanges in order to fulfill the minimum trading volume requirements of the Exchanges (the "**Trading Volume Requirements**");

    1.2.2    price and market management system and trading volume;

    1.2.3    strategy for long-term and weekly planning;

    1.2.4    a dedicated personal manager for the project to assist with the needs of Client.

11.    Further, GOTBIT's contracts with clients conditioned payment for GOTBIT's services on GOTBIT's fulfillment of the client's trading volume requirements:

1.4    The Market Maker agrees that it is solely responsible for fulfilling the Trading Volume Requirements and shall promptly notify Client in the event it anticipates or becomes aware of any potential or actual failure to meet them. The Market Maker acknowledges that its ability to continue as a market maker is dependent upon its ability to meet or exceed the Trading Volume Requirements and will allocate the necessary resources and take all reasonable measures to achieve the Trading Volume Requirements as agreed upon with the Client . The Fee shall not be due for months where the Market Maker fails to meet the Trading Volume Requirements, including all the events stated in Section 1 (e.g. Suspension Events).

12.    GOTBIT and its employees engaged in manipulative trades to artificially increase the trading price and volume of cryptocurrencies for the purpose of inducing others to buy them and to prevent the tokens from being delisted on centralized exchanges.

13.    GOTBIT and its employees used multiple cryptocurrency wallets to carry out and conceal the source of the manipulative trades.

14.    GOTBIT and its employees acquired for clients reduced trading fee accounts offered by exchanges in order to engage in manipulative trading of clients' cryptocurrencies at lower costs.

15.    GOTBIT employees participated in Telegram chatrooms to discuss the trading of various cryptocurrencies. ANDRIUNIN regularly held meetings with GOTBIT employees, including KEDROV and JALILI, to discuss "Gotbit Goals" and to obtain a "Weekly Summary" of GOTBIT's operations.

16.    GOTBIT employees maintained business records containing employees' assignments to various GOTBIT clients, as well as data about the "Created Volume" that GOTBIT generated through wash trades for certain clients and the "fees" paid to GOTBIT for those illicit services.

17.    GOTBIT provided illegal volume creation services to clients that included cryptocurrencies created and/or promoted by individuals located in the United States and cryptocurrencies on trading platforms available to investors located in the United States.

18.    For example, GOTBIT engaged in manipulative trades to artificially increase the trading price and volume of the Robo Inu cryptocurrency token. Between February 2022 and May 2024, GOTBIT employees participated in Telegram chatrooms and on videoconferences with promoters of Robo Inu; used GOTBIT's algorithm to increase the daily trading volume of the Robo Inu token at the promoters' request; advised the promoters to increase volume in a manner that looked "organic"; and sent reports to the promoters about the trading volume that GOTBIT generated. On at least one occasion, traders for GOTBIT engaged in manipulative trading that increased the daily trading volume of the Robo Inu Token to a value that, in part, caused the Robo Inu Token to start "trending" on CoinMarketCap.

19.    GOTBIT also engaged in manipulative trades to artificially increase the trading price and volume of the Saitama cryptocurrency token. Throughout 2023, GOTBIT employees

5

communicated with promoters of the Saitama token over Telegram; acquired accounts with reduced or no trading fees to manipulate trading of the Saitama token on multiple cryptocurrency exchanges; and increased the daily trading volume of the Saitama token upon the Saitama promoters' request and/or to meet exchange trading volume requirements.

20.    GOTBIT received client payments using cryptocurrency wallets, including the wallet address ending in 052E3 (the "GOTBIT Wallet"). In connection with GOTBIT's operations, GOTBIT transferred millions of dollars in cryptocurrencies from the GOTBIT Wallet to a Binance account in ANDRIUNIN's name used for GOTBIT's business and to other cryptocurrency wallets that GOTBIT, ANDRIUNIN, and others controlled.