UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALEKSEI ANDRIUNIN,<br><br>Defendant. | Case No. 1:24-cr-10190 |

**SENTENCING MEMORANDUM OF ALEKSEI ANDRIUNIN**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

I.  FACTS ................................................................................................................... 4

   A.  Childhood.......................................................................................................... 4

   B.  Adolescence ...................................................................................................... 7

   C.  Gotbit Begins .................................................................................................. 13

   D.  Volume Creation: Exchanges, Meme Coins, "Life-Change Money" & the Degens........ 15

   E.  Aleksei's Leadership of Gotbit ...................................................................... 18

   F.  Arrest, Acceptance, Incarceration and the Future.......................................... 26

II.  TIME SERVED IS THE JUST AND APPROPRIATE SENTENCE.................................... 30

   A.  A Sentence Other Than Time Served Creates Unwarranted Sentencing Disparities ....... 30

      1.  Aleksei's Time Served Equals the Total Incarceration a Similarly Situated American Citizen Would Serve on the 15-Month Sentence the Government Recommends ................................................................................................. 31

      2.  Aleksei Has *Served* More Time Than the *Sentences Received* by the Vast Majority of Equivalent Defendants..................................................................... 33

      3.  Aleksei Has Already Served a Harsher Sentence Than Similarly Situated Defendants ...................................................................................................... 34

      4.  As a Deportable Alien, Additional Punishment Would Be Disproportionately Harsh ............................................................................................................... 36

   B.  Time Served is Warranted Given Aleksei's Personal History and Characteristics .......... 39

C.  The Nature and Circumstances of the Offense Merit a Sentence of Time Served ........... 42

D.  Aleksei's Punishment Adequately Deters Others and Promotes Respect for the Law..... 46

E.  Aleksei's Forfeiture More Than Satisfies Any Fine and Restitution Is Not Applicable .. 47

CONCLUSION....................................................................................................................... 48

# TABLE OF AUTHORITIES

## Cases

*Abdul-Kabir v. Quarterman,* 550 U.S. 233 (2007) ........................................................ 45

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 30, 48

*Graham v. Florida,* 560 U.S. 48 (2010) ..................................................................... 45

*Handa v. Clark*, 401 F.3d 1129 (9th Cir. 2015) ............................................................. 37

*Pepper v. United States*, 562 U.S. 476 (2011) ............................................................. 30

*United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) ..................................................... 39

*United States v. Anderson*, No. 18-cr-71, 2021 WL 776975 (W.D.N.Y. Mar. 1, 2021) ................ 42

*United States v. Black*, No. 16-cr-00370  (S.D.N.Y. Nov. 13, 2019) .................................. 35

*United States v. CLS Global FZC LLC*, No. 1:24-cr-10293 (D. Mass. 2025) ............................ 34

*United States v. Conti*, No. 1:14-cr-00272-JSR-6 (S.D.N.Y. 2016) .................................... 38

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) .................................. 46

*United States v. Germosen*, 473 F. Supp. 2d 221 (D. Mass. 2007) .................................... 40

*United States v. Harkonen*, 08-cr-00164 (N.D. Ca. 2011) ............................................. 36

*United States v. Hercules*, 947 F.3d 3 (1st Cir. 2020) .............................................. 36

*United States v. Mack*, No. 17-cr-138, 2020 WL 6161255 (E.D.N.Y. Oct. 21, 2020) ................... 42

*United States v. Michel,* No. 1:23-cr-00418 (E.D.N.Y. 2023) ......................................... 35

*United States v. Mullings*, 131 F. Supp. 3d 1 (E.D.N.Y. 2015) ................................... 40, 48

*United States v. Navarro-Diaz*, 420 F.3d 581 (6th Cir. 2005) ....................................... 32

*United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................. 39, 40

*United States v. Pacheco-Soto*, 386 F. Supp. 2d 1198 (D. N.M. 2005) ................................ 32

*United States v. Panousos*, No. 17-cr-10227 (D. Mass.) ............................................. 35

*United States v. Phillips*, No. 22-cr-00138 (S.D.N.Y. Jun. 28, 2024) .......................................... 35

*United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) .................................................................. 35

*United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728 (E.D. Va. 2005) ................................... 36

*United States v. Ramos*, No. 12-cr-556, 2020 WL 7128967 (S.D.N.Y. Dec. 4, 2020)................. 42

*United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wis. 2003) ............................................ 39

*United States v. Roth*, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008)............................................... 36

*United States v. Sales*, No. 17-cr-10110 (D. Mass.) ..................................................................... 35

*United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014)............................................................. 39

*United States v. Yang*, No. 1:23-CR-0258-SDG, 2024 WL 5202493 (N.D. Ga. Dec. 20, 2024) . 41

*United States v. Zhao,* No. 2:23-cr-00179 (W.D. Wash. 2023) ..................................................... 35

**Statutes**

18 U.S.C. § 3553(a) ........................................................................................................... 30, 31, 46

18 U.S.C. § 3571(b) ..................................................................................................................... 47

18 U.S.C. § 3632(d)(4)(C) ............................................................................................................ 32

8 U.S.C. § 1226(c) ........................................................................................................................ 36

**Other Authorities**

United States Sentencing Commission ("U.S.S.G."), Age Policy Statement, § 5H1.1 (2024) .... 41

# INTRODUCTION

Born to a family with little money but a deep respect for learning and hard work, Aleksei Andriunin willed himself to: a professional chess ranking by age 10; a place in Russia's national volleyball training program by 12; a spot in Moscow's top school for math and physics by 14; a scholarship to Lomonosov Moscow State University, the Russian MIT, by 18; a marriage to the love of his life—after five years together—by 20; and a position atop a surging blockchain company by age 24—a company he founded at 18, grew to over 180 employees, and led to quadrupling revenues year after year with no end in sight.

On October 7, 2024, at age 26, the brilliant boy driven to break free of the bounds of his childhood had succeeded beyond his imagination's measure; in his words, he had "caught a star." In fact, he'd even started to slow down a bit. After years working with a therapist, Aleksei was spending more time with his wife in their adopted neighborhood in Lisbon, trusting more in the leadership team he had brought in to run his company—a collection of experienced executives 10 or 15 years his senior with backgrounds ranging from finance to human resources to marketing—and enjoying the ability his professional success had given him to help family, friends, and employees.

By the night of October 8, Aleksei sat in a Portuguese prison cell alongside eight felons. He had been arrested on U.S. fraud charges brought against him and his company, Gotbit, which had become one of the world's top cryptocurrency market making firms. Earlier that day, a judge told him he faced 45 years in prison. For the next week, he held tight to a razor, knowing that he could not withstand another 45 years of this.

Aleksei had tried to build Gotbit the right way at every turn. He had visions of taking it public in a few years. He'd hired anti-money-laundering and sanctions experts to make sure its transactions didn't run afoul of the law. His eight-person Human Resources department had their

pick of an endless line of MSU's best graduates, all hoping to follow in Aleksei's footsteps. And Gotbit was known for delivering best-in-class client service, delivering overlapping systems to quickly respond to client needs and strict protocols to ensure their trust—on the few occasions Aleksei caught employees cheating clients, he summarily fired them and made the clients whole. In the exploding, unregulated and fraud-filled cryptocurrency markets, its clean reputation was the keystone of Gotbit's success.

Indeed, Aleksei was so sure he ran Gotbit the right way that when the FBI froze all its funds 24 days before his arrest, rather than fleeing to extradition–free Dubai, Singapore, or Moscow, which together house the vast majority of companies in the cryptocurrency markets as well as the people who own and staff them, he stayed put in Lisbon, consulted his team, and instructed them to contact the FBI and find out what the problem was. He assumed that one of Gotbit's systems had failed and a client transaction had triggered a money-laundering or sanctions issue.

Aleksei's faith in Gotbit's probity was misplaced. He pled guilty because he is guilty—he and his company committed the crime charged. But Aleksei did not believe he was committing a crime—he and Gotbit were in the heartland of the industry's status quo and he thought he wasn't harming anyone. It is an extraordinary fact in a fraud case, and one the government does not contest.

It also makes perfect sense after reading the 41 letters supporting Aleksei and learning who he has been throughout his young life. Aleksei would never have intentionally engaged in behavior he thought caused harm. Indeed, to those who know him, his life has been defined not by the academic, athletic or professional success noted above, but by his seeking out and

assuming responsibility for others and then, very intentionally and thoughtfully, doing all he can to care for them, including reflecting upon how he can grow and develop to do so.

There are many elements to Aleksei's story that could make him bitter or self-pitying: how hard he worked his whole life to lift himself up from his difficult childhood, always trying to do the right thing; how much effort he put into making Gotbit an upstanding, professionally run company; how he reasonably thought the conduct of conviction was legal given its ubiquity in the unregulated cryptocurrency markets; how harshly he has been punished when others who did the same or worse have gotten off scot-free. But that is not who he is.

From the moment he met with counsel and understood the charges, Aleksei's acceptance of responsibility has not wavered. He gave up his right to challenge extradition and avoid facing the charges altogether; he pled guilty at the first opportunity upon reaching the U.S.; he stands ready to accept the consequences of his behavior.

And in the eight months he has served—partially in a Portuguese prison that would pass muster *nowhere* in the United States, and partially at the "amazing" (to quote Aleksei) Wyatt (but during a period in which, as Your Honor knows, he experienced long-untreated, tortuous nerve pain) he has worked hard on himself, grown and set new goals. Aleksei has not only refused to engage in denial or self-pity, he has, to the extent possible, seized the time it has given him to improve himself, understand his mistakes, and realize how he needs to change. This ranges from the obvious—being more cautious and, if ever he starts another business, consulting with older and more broadly experienced lawyers—to the deeper work of realizing how his desire to create stability led to blindered workaholism that cut him off from what matters most: his life with his wife Yulia.

Aleksei has paid harshly for his mistake, spending eight months in jail, much of it very hard time, and nearly all of it separated by thousands of miles from Yulia and his family. He has sacrificed forever the company he spent his late teen years and entire adult life building, and he has forfeited the entirety of Gotbit's $23 million—his own money—despite the inability to quantify loss in this case.

The PSR details that Aleksei has already *served* more time than the *sentences received*— without FSA or good time credits or early release—by the vast majority of fraud defendants within his Guidelines range. As of the day of sentencing, he will also have actually served the same amount of time that a U.S. citizen who received the 15-month sentence the government recommends would. Aleksei's punishment has been severe.

Aleksei Andriunin committed the crime of conviction. But he never chose to break the law. He has not made excuses because of it, but chose to fly to the U.S., accept responsibility, and face the consequences for the greatest mistake of his young life. He has been punished harshly but has used his time in prison well and looks out toward a bright future with Yulia and soon, God willing, their children.

A sentence of time served is the just result in this case. For the reasons herein, we respectfully request Your Honor to impose it.

I.    **FACTS**

A.  <u>**Childhood**</u>

Aleksei Andriunin grew up in Izmailovo, Russia, a poor, crime-ridden neighborhood on the outskirts of Moscow. His parents both attended university—his mother obtained two advanced degrees—but the family struggled financially in the chaotic Russia of the late 1990s and early 2000s, still reeling from the USSR's collapse.

Aleksei's father had achieved some success by age 25, when Aleksei was 2. But when criminals seized his business at gunpoint and killed his partner, he fled to Siberia, leaving Aleksei to be raised, through the age of 12, by his mother and paternal grandfather in his grandfather's 600-square-foot government-issued apartment. When Aleksei turned 12, his mother remarried and, soon after, had another child and moved out. By the time Aleksei was 16, she moved to Serbia with her new family, while he stayed in Moscow with his grandfather.

Aleksei was responsible from a young age. He worked to help support his family financially from age 12, but even as a little boy, he did what he could. His mother writes about him picking up the groceries she'd leave at the store and cooking and serving her breakfast in bed every Saturday morning.[1] And after his little brother was born, Aleksei would pick him up from daycare, play with him, and tuck him in at night.[2]

Aleksei grew up surrounded by books and he "developed a lively mind, an interest in the world, the ability to think and look for connections." L. Yolkina (Aunt) Ex. E.2 at 2. His mother read him historical literature and once took out a bank loan so she and Aleksei could travel to Italy to visit the museums and architecture they'd read about. His grandfather, an M.D. with a Ph.D., spoke with Aleksei every evening about math, physics, programming, medicine and sports.

---

[1] Aleksei received 41 letters of support from family and friends, most of which were written in Russian. We have translated the letters to English for the Court's convenience, but are able to provide the Russian originals if Your Honor would like them.

[2] Many of the 41 letter writers discuss the young Aleksei's strong sense of responsibility as well. His aunt writes that he was "not afraid to take responsibility . . . not afraid to admit that he was wrong . . . ." L. Yolkina (Aunt) Ex. E.2 at 2. His grandmother recalls him as "an amazingly bright and responsible child," and his best friend from childhood notes that "he just always acted a little wiser, a little ahead of his time." S. Yolkina (Grandmother) Ex. E.5 at 1; M. Trishina (childhood friend) Ex. E.4 at 1. His middle school teacher writes: "Honesty, courage, the ability to take responsibility for his actions, this is what I really appreciated in Lesha." T. Khvorostyuk (Teacher at Lyceum ) Ex. E.8 at 2.

At age five, Aleksei's grandfather taught him to play chess and within a year, Aleksei was beating him. For the next five years, Aleksei devoted himself to the game, first practicing endlessly against computer programs and, from age 7 on, attending a chess school for five hours a day after school. When his first tournament ended with a quick, stinging defeat and temper tantrum, Aleksei practiced harder, began winning tournaments throughout Moscow, and by 10, had achieved a professional ranking. By 11, his peers began to outperform him in tournaments and he realized that his future would not be behind a chessboard. Chess, however, showed him a path beyond his circumstances.

Aleksei walked past used syringes on his way to school; his mother, despite an MBA and a master's in public economy, barely eked together a living; violence and drugs often accompanied adolescence in Izmailovo. His aunt writes that, in this environment, "where change seemed almost impossible . . . . [Aleksei] looked for opportunities, took steps into the unknown without illusions, but with a clear goal, without support behind him, at his own risk." L. Yolkina (Aunt) Ex. E.2. at 3. She explains:

> [He] had an inner urge to go further. Not against the environment - just wider than it. He didn't want to run away, he wanted to grow . . . to push the limits, to search for more. *Id.* at 1.

To do so, "[Aleksei] realized that . . . he had to be healthy and full of energy." S. Strigo (personal assistant & friend) Ex. E.7 at 1.

Aleksei was born with both Gilbert's Syndrome, a congenital liver defect that prevents him from processing protein correctly. As a child, it rendered him so "very often and not standardized sick" that he was placed within "health group 2 (almost disability)." E. Garanina (Mother) Ex. E.1 at 1.

At age 12, Aleksei took responsibility for his health and changed it. His aunt writes:

His health was not the strongest, and he knew it. He wanted to be not only smart, but also strong and enduring, so that he could feel the support in himself. . . . There was no opportunity to go to the gym, but Alesha found a solution: he started to work out on street exercise machines. In any weather - rain, snow, wind - late at night, after his studies and part-time jobs, he went to the site and worked out. . . . It was his way of keeping himself in shape and not stopping despite the difficulties. (L. Yolkina (Aunt) Ex. E.2 at 2).

### B. Adolescence

To help Aleksei continue improving his health, his grandfather suggested he try volleyball. He gained admission to one of Moscow's eight sports schools, the Nika Sports School of Olympic Reserve #65 ("Nika"), and joined a team with evening training sessions. Getting into Nika wasn't hard—the coaches primarily looked for potential—but players who could not excel were quickly weeded out. Aleksei managed to keep his spot, and thus began five years of six-day-a-week, 2½-hours-a-night volleyball training at Nika, a regimen that led to national competitions and, eventually, Aleksei making his university team—an athletic achievement akin to playing NCAA Division I sports in the U.S.

The story of Aleksei's physical evolution from sickly child to college athlete explains the near universal respect and attention the letter writers pay to Aleksei's devotion to staying in shape. It was a stepping stone in his journey away from his childhood.

The next was academic achievement. As a child, Aleksei attended the best school in his area, a "big deal," according to Aleksei's best friend there. M. Trishina (childhood friend) Ex. E.4 at 1. But after Aleksei excelled in successive national math Olympiads in fifth and sixth grades,[3] his mother began looking for a school for children gifted in math.

---

[3] Russian grade levels correspond to their American counterparts, but students graduate after 11th grade.

Aleksei applied to the Lyceum Second School, the top math school in Moscow. But he didn't study and failed the first of the school's four entrance exams, a painful blow to his confidence. He vowed to bear down and do the necessary work to get in the following year.

Aleksei's mother secured him a place in a school that offered an advanced math class, and he began making the daily three-hour commute there by trolleybus. It was not a private school, but it served the children of Russia's elite, and Aleksei's lack of wealth made him a target for the school's bullies. This resulted in what Aleksei refers to as a lifelong "allergy to rich kids."

The next year, Aleksei claimed a spot at the Lyceum, and as with chess and volleyball, the lesson he took away from the experience was the same—hard, steady work leads to results. He applied it over the next four years and in his final year at the Lyceum, he won a scholarship to Lomonsov Moscow State University ("MSU"), Russia's MIT.

Playing volleyball at the Olympic Reserve level and excelling at the Lyceum made Aleksei a very busy teenager. Volleyball was a 25-hour weekly commitment, and his school kept a six-day schedule, with each day entailing three-plus hours of commuting, six of class and five of homework. On top of this, Aleksei also worked.

"Alyosha understood that it was not easy for the family and tried to help. . . . He was never ashamed of either labor or responsibility." S. Yolkina (Grandmother) Ex. E.5. At first, that meant summer jobs: at 12, cleaning—"mopping floors, cleaning walls, peeling off gum"— alongside his grandmother and aunt at a nearby college; at 13, delivering books around Moscow; at 14, interning at the bank where his mother worked; and between 15 and 17, helping organize and put on medical conferences. L. Yolkina Ltr., Ex. E.2 at 2.

At age 16, Aleksei started working during the school year, too. Playing volleyball so intensively, Aleksei needed good sneakers and wore through them quickly. It was a combination he couldn't afford, and one that led him to Moscow's (and, he was soon to discover, Russia's) sole factory discount sneaker store, the Nike Outlet, which sold the prior year's models at deep discounts. When Aleksei bought his first pair, showed them off to a competitor the next weekend and found himself saying that, yes, he could get him the same ones at a fraction of their retail price, he had founded his first business and secured his first customer.

For the next three years—the last two of high school and the first of college—Aleksei bought sneakers at the Outlet's price, marked them up, and resold them for about half of their standard retail price—a huge value for Russian teen athletes and a profitable business for Aleksei.

Within a year, he was re-selling upward of 200 pairs of sneakers a month during volleyball season, his daily schedule a blur of sneakers, studying and volleyball. Up at 6:30, he packaged the prior day's purchases for shipping and dropped them at the post office on his way to school. After school, he traveled to the Nike Outlet and set up shop: photographing the day's new stock, sending the photos to teenage athletes across Russia, and then, while doing his homework in the nearby Teremok, Russia's version of McDonald's, pausing each time an order came in to make a purchase. He offered home delivery to customers in Moscow (dropping them off on his way to volleyball), and his friends teased that he looked like a "peddler from the '90s" with his two ever-present, oversized Nike bags stuffed with sneakers. But the business was far from a joke. He scaled it to the point where, in a good month, he could make $5,000.

Despite the profits, Aleksei didn't save much. At 16, he had started supporting himself and his future wife, Yulia, and over the years of the sneaker business, he had come to support a

number of their relatives, too. His scholarship to MSU covered tuition but it didn't come close to paying for his and Yulia's food, housing and other living expenses, let alone helping out family. He thus took his second year at MSU off to earn money for the next five (MSU only offered a six-year master's program in the mathematics). And when his father suggested that Aleksei intern at his friend's startup selling micro-insurance policies on the digital blockchain, Aleksei jumped at the chance, setting off the series of events that led to this sentencing.

Before closing the chapter on Aleksei's life prior to Gotbit—the first 17 of his 26 years—it's worth briefly revisiting who the responsible little boy had become in adolescence. The doctor for whom Aleksei helped organize medical conferences remembers being struck by Aleksei's "ability to listen and not say too much—a rare quality in a young man." V. Mischenko (Doctor/neighbor) Ex. E.25 at 1. He continued:

> Aleksei never tried to impress . . . his sincerity and seriousness came through. He was always . . . older than his years, mature beyond his years. *Id*.

He was also generous: using his savings to motivate the volleyball team with pizza if they could secure a win ("it was the first and most delicious pizza of my life"); teaching a friend from an inferior school theorems for a math Olympiad; and offering work selling sneakers to the same friend after he confided that he was constantly hungry because he couldn't afford lunch.[4] I. Kuznetsov (Friend) Ex. E.6 at 1.

---

[4] It didn't work out:

> Selling turned out to be a lot harder than just solving math problems and I couldn't handle it . . . . Watching Aleksei and how he was selling, I was always surprised how you can always please the client . . . and make him satisfied. Unfortunately I could not learn this skill from him. I. Kuznetsov (Friend) Ex. E.6

But most of all, Aleksei remained unafraid to shoulder responsibility. The trait was evident in typical adolescent activities like serving as the captain of the volleyball team and atypical ones like supporting his and Yulia's relatives, but it is Aleksei's relationship with Yulia that shines the brightest spotlight on it.

Yulia, too, was a volleyball player at Nika. They met and became friends at 13, and by 15 they had fallen in love. Aleksei soon convinced his grandfather to let her move into their apartment to escape abuse at home. They have shared a home ever since.

Yulia's life had been hard. In addition to the abuse, ███████████████████████ ████████████████████████████████████████████5 When she moved in, she had just suffered the loss of her only sibling, an older sister who died beneath the wheels of an oncoming train.

Her pain was overwhelming: her expression of it included ███████████████ ████████████████████████████████████████████ ████████████ But at 15 years old, Aleksei not only stood by her but began the patient, painstaking process of learning how to best support her.

Yulia explains:

> Lesha tried to help me throughout my childhood. When we were [first] dating, he would come to my house just to hug me and talk to me when I was crying, even though it took him an hour and a half to get there. He knew that I wouldn't call him in and he knew that he was coming for 15 minutes to walk around my house in the cold and support me and bring me back to normal. . . .

---

5 Given its sensitive nature, we respectfully request that the Court permit (i) this text and certain other similarly sensitive text in both this submission and the letters of support contained at Exhibit E to be filed in redacted form, and (ii) the original of this letter and other similarly sensitive materials contained at Exhibit B to be filed under seal.

I have experienced episodes of  Alex was very worried when he saw this for the first time and treated me with immense care: he asked me questions about how best to help me in these moments, what to do and what not to do, researched the characteristics of such reactions on the internet to better understand me, and figured out how to help without causing harm. . . .

I never once felt rejected or judged because of  He is a very sensitive and caring person; I am incredibly lucky to have him. (Y. Andryunina (Wife) Ex. B.3 at 1-3).

Aleksei eventually consulted a therapist to try to better understand Yulia, but he soon began to explore how he could grow to become the partner to her he wanted to be and, later, the person, son, brother, friend and boss he wanted to be as well.

Aleksei's thoughtful, determined, decade-long effort to be a good partner to Yulia has contributed to their each being sustained by a marriage that nearly all the letter writers cite as ideal.[6] For her, it is the type of relationship where they are "each other's partners, best friends,

---

[6] To take just a few examples:

- Their union generates a different spectrum of feelings in people (admiration, envy, bewilderment, joy). E. Garanina (Mother) Ex. E.1 at 4.

- Their attitude to each other was special - free, warm, deep. At that time, as a young girl, it became clear to me for the first time that true love existed - I could see it not in words, but in their morning jogs, tender moments, care, respect and devotion. K. Kolosova (Friend from MSU), Ex. E.12 at 1.

- [H]e loves his wife . . . with a calm, steady commitment that never seeks attention. In his early twenties, at a time when most students were focused on nightlife and going out, Aleksei had already married the love of his life. Together, they steadily built a strong relationship marked not

best critics, and just happy to discuss any topic with each other. We grow together, we can be vulnerable, funny, show weaknesses, make mistakes, fight, understand, forgive, support, and just be ourselves." *Id.* at 1. Aleksei calls Yulia his "main luck in life." Aleksei Andriunin Ltr., Ex. A at 5.

Their story encapsulates the Aleksei portrayed in the 41 letters in support and shown throughout his childhood: taking responsibility, setting a goal, unlocking the riddle of how to achieve it, and then working tirelessly and transforming himself to do so.

### C.  <u>Gotbit Begins</u>

At age 18, when Aleksei agreed to intern at his father's friend's business, he knew almost nothing about it. He discovered that the company, Rega Risk Sharing, offered micro-insurance policies—for example, they would insure a traveler's luggage for a single flight—and that to secure financing, it was selling a form of cryptocurrency known as "utility tokens." By the time Aleksei started, Rega's initial fundraising had taken place, with investors purchasing soon-be-launched tokens that would give them (i) access to access Rega's insurance products and (ii) a chance to profit if the token's price rose after it was launched and began trading on cryptocurrency exchanges. His father's friend tasked Aleksei, the smart new employee fresh off his first year at Russia's top technical university, with figuring out how to get the token listed and trading.

Aleksei began assessing more than 100 cryptocurrency exchanges to decide which would be best for Rega's token. He poured over the trading records of similar tokens, engaged in

---

just by affection, but by mutual respect and a fierce loyalty that taught me more about mature love than any book ever could. He had a profound impact on how I viewed relationships at the time, and I believe their bond played a role in shaping my own and helped me realize I was ready to propose to my wife. I feel that Aleksei has a way of inspiring others to love better. Nikolay Dementyev (friend), Ex. E.24 at 1-2).

negotiations, and prepared the compliance materials Rega would need to obtain a listing. When he chose two and contacted them to make payment, the exchange managers told him that Rega would need to hire a "market maker" to support the token, including by meeting the exchange's "activity requirements"—a minimum threshold for the daily transaction activity or "trading volume" necessary to maintain a listing.

Aleksei's job now became finding the right market maker. Each provided the same basic service: an algorithm that (i) ensured the token maintained the same price across any exchanges it traded on; (ii) provided liquidity by matching buyers with sellers and, as needed, serving as the counterparty;[7] (iii) transacted in the currency for owners, allowing them to strategically increase their stake or sell it off to raise capital; and (iv) provided "volume creation"—i.e., wash trading—whereby the market maker bought and sold the currency to itself at a price between the best bid and best offer in order to meet the exchanges' activity requirements without moving the price.

When Aleksei's boss (his father's friend) discovered that hiring a market maker would cost more than Rega could afford, he asked if Aleksei could build software to perform the same functions himself. Aleksei recruited a coder friend from MSU and, based on what he had learned from his analysis of the exchanges, his conversations with the market makers, and his study of the marketing materials they sent him, together they did.

---

[7] On mature exchanges like, for example, NASDAQ, listed shares are sufficiently liquid that there is always a counterparty to match against the current best bid (the highest offer to buy) or ask (the lowest offer to sell). For thinly-traded, newly-listed cryptocurrencies, market makers monitor the currency and, as needed, use the client's own funds and a cache of reserve currency to serve as the counter party to anyone looking to transact. This is both a perfectly legal—a cryptocurrency's owner can trade in it—and valuable service since few things scare away investors faster than the worry that an investment is illiquid.

Rega failed six months later, but before it did, Aleksei met Vlad, a 27-year-old who owned and operated a company offering marketing services to businesses looking to launch utility tokens. When Aleksei told him about Rega and showed him the algorithm, Vlad asked Aleksei to partner with him, suggesting he pitch his clients on using the algorithm instead of hiring outside market makers, and split the additional fees he could charge for the service with Aleksei. Aleksei agreed and, over the next few months, he would split the approximately $200 he received for each of Vlad's clients who used the algorithm with his coding partner. A few months later when Rega failed, Aleksei and his partner decided to sell the use of their service more broadly, and Gotbit was born.

For its first two years, Gotbit was not a serious enough business to allow Aleksei to support himself and Yulia and re-enroll at MSU full time. So, Aleksei started a number of other companies, from importing massage guns (the most successful) to building a network of charging stations for electric cars (the least). And while Gotbit ticked along in the background, its profits were minimal. By early 2020, eighteen months after its start, Gotbit had a handful of clients and two or three MSU student employees who maintained the algorithm part time.

Then Covid hit. Governments started providing checks to their stuck-in-their-homes populations and bored young men turned to cryptocurrency trading. Gotbit rode the industry's wave of growth and began its long climb to success.

### D.  <u>Volume Creation: Exchanges, Meme Coins, "Life-Change Money" & the Degens</u>

Before analyzing Gotbit's rise, and in order to best understand both the nature and circumstances of the offense (Gotbit providing the volume creation service) and why Aleksei is guilty of fraud without ever intending to break the law or realizing that he was, it is helpful to briefly review the dynamics of the cryptocurrency markets.

Back in 2018, when Aleksei began searching for exchanges to list Rega's token, there were more than 100 in operation. Most were recent start-ups—the entire industry was still less than four years old—founded primarily by young men from around the world sitting behind laptops. Unlike traditional stock and bond markets, the exchanges had no physical presence and were completely unregulated.

Consistent with Aleksei's experience obtaining Rega's listing, exchanges' trading volume requirements drove the need for market makers to provide volume. For the exchanges to successfully compete, they needed to reflect a busy marketplace. There was (and still is) a hierarchy of exchanges, and the more active the exchange, the more attractive it is both to the cryptocurrency owners who pay its listing fees and the traders who buy and sell currencies, paying a transaction fee each time. By setting a high volume requirement—typically $50,000 to $200,000—the exchanges could tout big overall volume numbers, climb the rankings, attract new listings and traders, and make money.

Neither the exchanges that demanded trading volume nor the market makers who provided it attempted to hide what they were doing. The exchanges openly demanded stratospheric volume requirements that could never be supported by fledgling companies like Rega or the relatively small community that traded their currencies—one 2022 study found that more than 70% of all trading on unregulated cryptocurrency exchanges, like those Aleksei's customers traded on, is from wash trading.[8] And the market makers who provided the fake volume advertised it as a core service. Aleksei followed suit. In 2019, a 20-year-old Aleksei

---

[8] Cong, et al., *Crypto Wash Trading*, National Bureau of Economic Research Working Paper 30783, December 2022, http://www.nber.org/papers/w30783.

spoke openly about wash trading with a reporter on camera, even referring to it as a "questionable" practice that he assumed would eventually be addressed by regulation.

Volume creation's prevalence was not lost on the insular and extremely online community of young men who account for the vast bulk of trading in utility tokens and "meme coins"—the other kind of cryptocurrency at issue here. Because it is helpful to understand them, it is worth briefly reviewing how and what they trade.

Investing in crypto is about determining which currency the investor community will rally behind next, driving up its price by buying it, and through these purchases creating value where none had existed. More than 40,000 meme coins are created every day.[9] The majority are born valueless and stay that way—an unsurprising result for, say, a cryptocurrency whose sole distinguishing feature is a Shiba Inu wearing a pink knitted hat.[10] But correctly predicting which coin will catch the market's imagination the way that, for example, the $1.37 billion-market-cap Fartcoin did, can result in what's known as "life-change money," like the approximately $18 million one early Fartcoin investor made in two months.[11]

Rather than drawing attention to their currency through a meme conveyed in a coin's name and/or photo, utility token issuers like Rega try to generate excitement about their business's prospects. A token's value is not directly tied to company performance like a stock or

---

[9] Explaining meme coins and why the joke-inspired cryptocurrencies often crash, PBS (Apr. 17, 2015), https://www.pbs.org/newshour/show/explaining-meme-coins-and-why-the-joke-inspired-cryptocurrencies-often-crash.

[10] What is dogwifhat, The Big Whale, https://www.thebigwhale.io/tokens/dogwifhat.

[11] Solana Trader Makes Over $35 Million From ai16z and Fartcoin, Here's What He's Buying Now, BITCOINIST, https://bitcoinist.com/solana-trader-makes-35-million/; Fartcoin Price History, CoinMarketCap, https://coinmarketcap.com/currencies/fartcoin/historical-data/.

bond, but if an issuer is prominent or its business plan suggests it will succeed, the chance its token will catch fire increase.

From the investor's perspective, very little separates meme coins from utility tokens—with each, they are simply trying to divine which ones the market will rally behind. Because such a result is *exceedingly* rare, exchanges are plastered with bold-faced warnings that underline the risks, e.g.:

> Digital Asset trading is subject to severe market risk and price volatility. Changes in value may be significant and may occur rapidly and without warning . . . . You may not get back the amount you have invested, and there is severe risks of losing all of your assets.[12]

Given the odds, to maximize their chances of a payout, cryptocurrency investors typically spread small bets—$50 or $100—on tens or even hundreds of different coins and tokens, hoping that one of them will not go to zero, but change their lives. Perhaps not surprisingly, this community of investors refers to themselves as "Degens," which is short for degenerate gamblers.[13]

### E.  Aleksei's Leadership of Gotbit

In four and a half years, Gotbit grew from two or three part-time employees before Covid to more than 180 working fulltime at a professionally managed company with departments ranging from Business Development to Human Resources to Technology Development to Venture Capital.

---

[12] MEXC Risk Disclosure Statement, https://www.mexc.com/en-GB/risk.

[13] Crypto.com's glossary defines 'Degen' as "a slang term derived from the word 'degenerate'—often used in a lighthearted or self-aware manner. In the cryptocurrency space, it is often used to refer to individuals who engage in high-risk and speculative trading or investment strategies. Degen traders are typically associated with a willingness to take extreme risks in pursuit of potentially high returns." *See* https://crypto.com/glossary/degen.

From the start, Gotbit offered two innovations that gave it a leg up on competitors: a subscription model that provided more predictable cash flow and a "dashboard" that allowed clients to watch the algorithm trade their currency and to direct its trading. But in time, competitors copied the subscription model and tried their best to reproduce the dashboard (stocked with MSU graduates, Gotbit's technical prowess proved hard to beat).

The distinguishing factor that separated Gotbit from the vast majority of its competition was Aleksei.[14] Once the company began to grow, he put his whole self into it, and the traits that drove so many achievements in his young life also resulted in his company's success.

Most important was his willingness to take responsibility for Gotbit's clients, demonstrated through exceptional client service. Aleksei's friend who failed in the sneaker business marveled at how Aleksei could "always please the client, to understand his needs and make him satisfied." I. Kuznetsov (Friend) Ex. E.6 at 2. Aleksei made sure his employees learned how to do it, too. One former employee writes of Gotbit's "extreme customer focus." P. Dergulov (Gotbit Venture Capital Dept.), Ex. E.23 at 1. Another says that "the red line at every meeting was 'improving customer service.'" A. Bogomolov (Gotbit HR Head), Ex. E.18. A third described the process Aleksei initiated to systematize and prioritize client feedback as a "philosophy: listen and change." Anonymous Gotbit Employee, Project Management, Ex. E.13 at 2.

Aleksei understood that even a client launching a silly meme coin trusted Gotbit with their business, which contained their hopes, dreams, labor and investment. Gotbit delivered best-in-class customer service—from 24-hour trading teams to execute client orders round-the-clock

---

[14] By the time of Aleksei's arrest, Gotbit was one of the world's top five market makers, akin to CLS, the market maker Your Honor sentenced earlier this year. *See infra* pp. 34–35.

to near-instant client query response times to the technical effort put into maintaining the industry-best dashboard. Through this service, Gotbit became a brand that clients trusted.

And in the nascent cryptocurrency markets—one letter writer aptly called them the "Wild West"—Gotbit's reputation was the keystone to its success. M. Trishina (childhood friend) Ex. E.4 at 2. Indeed, when clients lost money due to a Gotbit failure—or even when they claimed they did—Aleksei would reach into his own pocket to make them whole. "His principle was simple, 'even if we made a mistake - we have to keep the client's respect.'" "Reputation was more important to him than profit." Anonymous Gotbit Employee, Project Management, Ex. E.13 at 1. Gotbit's head of Human Resources writes:

> [Aleksei] wanted to build a business that makes the crypto world, full of fraudsters, safer and more attractive for users. The crypto sphere is poorly regulated in terms of international legislation and full of fraud. The main currency in the crypto world is reputation and Gotbit's success confirms how much Aleksei and the [senior management] team valued reputation. (A. Bogomolov (Gotbit HR Head), Ex. E.18).

Aleksei focused not only on his clients' perception of Gotbit, but on his employees,' too. He focused first on inspiring them. Aleksei envisioned that in time, as cryptocurrency continued to grow and blockchain companies came to sit alongside mainstream giants of traditional finance, Gotbit would stand at the spot where investment banks, consultants and hedge funds intersect. Like an investment bank, it would launch clients' companies and support their trading; like a consultancy, it would advise them how best to succeed, drawing upon a knowledge base it built serving similar clients; and like a hedge fund, it would use that same knowledge to invest in currencies that stood the best chance of succeeding. He believed that Gotbit would follow this plan and go public as a "unicorn"—a start-up with a billion-dollar valuation. And he inspired Gotbit's employees to believe it, too.

He then worked tirelessly to help them grow to make it happen. In their letters, one Gotbit employee after another write about how Aleksei fostered their development. To quote a few examples:

- I felt a sense of trust, respect, and authenticity that stayed with me. Alexey had a rare gift: the ability to make people feel heard, valued, and safe. He did not just evaluate me for a position. He saw potential in someone who had not yet seen it in himself. That moment changed my life. (Albert (Gotbit, Senior Trader) Ltr., Ex. E.3).

- [T]hanks to him I find myself in an interesting, developing sphere. He showed me what it means to be successful and how successful people behave. He taught me to achieve my goals, no matter how ambitious they were, and finally gave me faith in myself, because, perhaps, no one else in the company believed in me as much as he did. (Savateev Andrei (Gotbit employee & childhood acquaintance), Ex. E.16 at 2).

- I met Lesha when I was leaving Deloitte [ ] and looking for a new job. A mutual acquaintance introduced us and recommended me as a specialist. Despite the fact that I was not initially interested in the area in which the company operates, I was impressed by . . . the kind of team [Aleksei] had built, the way he leads it, and overall, the kind of person he is. (P. Dergulov (Gotbit Venture Capital Dept.), Ex. E.23 at 1).

- Under his leadership, the company created internal development programs: training, coaching, and assessments. One of the employees I knew personally rose from an entry-level position to junior team leader in two years. And there were many such stories—he really knew how to bring out the best in people. (Anonymous Gotbit Employee, Project Management, Ex. E.13 at 1).

Aleksei also showed the same commitment to the industry as a whole. A Harvard MBA and fellow blockchain company founder writes:

> [Aleksei] consistently demonstrated integrity and a genuine willingness to support others. . . . [H]e was always eager to share his knowledge, offering advice to other founders, including myself, on navigating the complexities of the industry. I recall a specific instance at a conference in 2023 when Aleksei spent hours mentoring a group of young entrepreneurs, helping them refine their business strategies despite his own packed schedule. (Faraj Abutalibov (cryptocurrency industry acquaintance) Ltr., Ex. E.11 at 1).

It all became a virtuous cycle: the more he inspired his employees and their growth, the more successful Gotbit became. And the more successful Gotbit became, the more inspired and motivated to grow they all were.

From its start, Gotbit drew heavily from MSU—its first employees were Aleksei's friends studying math alongside him, or friends of friends in computer science or physics. Once Gotbit took off and became one of Russia's hottest tech companies, Aleksei achieved celebrity status at MSU, and his company had its pick of the school's top graduates. Their talent made the company better, and Aleksei made them better.

In early 2022, the war in Ukraine began and the ensuing sanctions and global condemnation took their toll on the Moscow-based and largely Russian-staffed company. Under new stress, Aleksei saw that the business had scaled to the point where it could not succeed exclusively with MSU students and recent graduates in their early twenties with no experience outside the company.

Over the course of that year, Aleksei conducted a major restructuring, recruiting older established executives with deep experience and proven track records to professionalize the company's management. He brought in senior leaders and gave them responsibility for Finance and Accounting, Human Resources, Anti-Money Laundering (AML), Sales, Business Development, Software Development, Venture Capital, Marketing and Market Making. Gotbit transformed into a fully professional, professionally managed company from top to bottom. In Aleksei's words:

> I wanted to be the dumbest person in every room. I wanted to learn from them every day. Every top manager at Gotbit was more experienced, smarter and older (except the Chief Technology Officer) than me. (Aleksei Andriunin Ltr., Ex. A at 10).

Aleksei's willingness to grow—a trait present throughout his life from chess through to Yulia—also defined his years at Gotbit. His head of Human Resources writes that "he openly admitted that he lacked competences in some areas and relied on the team, which allowed the team to grow." Yulia writes:

> He was very proud of what he was doing. . . . He took additional courses in economics and business management, marketing, and team management, as well as his courses in math (at night or at dinner we often watched some lectures from all these courses together, so I know it all). He was constantly improving his knowledge and skills and trying to apply them in business. (Y. Andryunina (Wife) Ex. B.3 at 5).

A classmate at MSU summed it up, "His strength lies in his constant inner work, his desire to help, and his attentiveness to people." K. Kolosova (Friend from MSU), Ex. E.12 at 3.

He brought all three to Gotbit and embedded them in its culture.

- The environment Aleksei fostered at Gotbit was one of mutual support, growth, and shared purpose. He led by example—not with authority, but with presence. He made time for people. He noticed when someone was struggling. And he always found small but meaningful ways to make us feel appreciated. (Albert (Gotbit, Senior Trader) Ltr., Ex. E.3).

- Aleksei would check in just to ask how things were going. These were not empty gestures. They were small acts of care that, over time, built trust and loyalty. He never looked down on anyone. He never sought recognition for the things he did. He simply showed up with kindness, humility, and heart. *Id.*

- When someone faced difficulties, he sought to find out what the cause was. He was looking for potential, offering other roles. (Anonymous Gotbit Employee, Project Management, Ex. E.13 at 1).

Finally, Aleksei gave Gotbit his inexhaustible capacity for hard work and his faith in the results it would bring. One former Gotbit employee states, "Aleksei literally lived his project." *Id.* Many others write of the same commitment:

- I saw him at work—hands-on, dedicated to every client, sacrificing sleep, food, even family time. Not for greed, but because he genuinely cared about the projects and people he worked with. (M. Trishina (childhood friend) Ex. E.4 at 2).

- I saw how he worked from morning until late at night, how he tried to keep everyone and everything together in difficult moments. It wasn't just a job—it was his meaning, his path. (Anonymous Gotbit Employee, Project Management, Ex. E.13 at 3).

- Work was a huge part of Aleksei's life and a super value for him. Realizing this, he could not stop putting his energies into it, as his own self-respect and a huge fear of losing him in his eyes depended on it. (Anastasia Kot (Aleksei's therapist) Ltr., Ex. E.22 at 1).

And with his constant care and relentless effort, the virtuous circle continued and Gotbit became something beyond the boy from Izmailovo's imagination: "I felt like I was in a movie," he writes. Aleksei Andriunin Ltr., Ex. A at 9.

Despite all his success, friends, family and co-workers report he remained the same person:

- What distinguishes Aleksei from most other business owners is that he is not at all arrogant. Despite his knowledge of economics, despite the fact that at the age of 22 he own[ed] a successful business, you could always just talk to him, play football, discuss problems. (A. Bogomolov (Gotbit HR Head), Ex. E.18).

- What I respected most was that he treated everyone equally. No matter your title, your background, or your experience, he approached you with the same genuine interest and respect. That consistency in his character left a deep impression on me. He did not speak about values. He lived them.

  In Russia, there is a stereotype that the richer person is, the greedier he is. When Aleksei's hard work and diligence began to bring him a lot of money, I began to fear how it might affect his character and attitude towards people. I worked remotely and was rarely in the office . . . [but when] we saw each other . . . I realized that everything was fine. I saw him eating ordinary foods together with ordinary employees . . . and when he decided to go to the store [and] asked if anyone needed anything, several employees asked him to buy something . . . and he bought and brought it. (Albert (Gotbit, Senior Trader) Ltr., Ex. E.3).

- Despite the scale of his business, Aleksei leads a modest lifestyle, never striving to rise in society. (Artyom (MSU friend) Ltr., Ex. E.31 at 1).

- [Aleksei] invited us to a party. We hadn't spoken for a long time, and I assumed that his interest and surroundings had changed. But I was extremely surprised to see ordinary guys he work[ed] with, his childhood friends and Yulia (his wife) . . . rather than pudgy rich men and models. (Polina (childhood friend) Ltr., Ex. E.21 at 2).

24

While Aleksei stayed true to the person he always had been, his success allowed him to care for those in need around him on a different scale. He bought homes for four family members as well as a close friend's father, and he paid for surgeries and other expensive medical procedures for family, friends' parents, an employee, and even an old acquaintance from grade school. In letter after letter, employees, families and friends tell story after story of him changing lives through generosity:

- In the spring of 2023, . . . after a failed attempt to get a residence permit in Turkey, I found myself stuck—no legal status, no clear future, and almost no hope left. . . . Alexey didn't just offer support—he took part of my burden onto himself. He talked to me every day, helped me think things through and work out possible scenarios. More than that—he offered and provided financial help so I could urgently relocate to Serbia and start over. He helped with finding housing, gave me contacts, and most importantly—didn't let me fall apart. . . . He helped me not because he had to, but because he simply couldn't walk away when someone he cared about was in trouble. (Ilya Koshelev (Gotbit employee) Ltr., Ex. E.27).

- Two years ago, [Aleksei] gave my mom a very significant gift. Because of diabetes, almost all of her teeth fell out. . . . Lesha found [a] clinic, spoke with the doctor, and paid for [the] treatment. . . . [R]ecently I saw that she smiles and is not shy to talk to people. (Y. Andryunina (Wife) Ex. B.3 at 4).

- About three years ago, a childhood friend was diagnosed with non-Hodgkin's lymphoma. . . . Both me and Lesha have known her since childhood—she was also in our sports school—but we are not close and have not communicated with her for many years. . . . [She] needed a bone marrow transplant, which required a search for a foreign donor . . . . [Aleksei] immediately helped [arrange it] and sent the funds to pay for it . . . The transplant was successful and now [she] is in remission, raising her children and doing well. *Id.*

- There were multiple occasions Aleksei helped my family financially when there was a struggle. (Gregory Melnikov (Captain in the Israeli Defense Force and childhood friend) Ltr., Ex. E.17 at 2).

- I had an idea for a business—key chains for women's self-defense. . . . I had just started to tell him, but Lesha didn't let me finish. It turned out that his friends were already running a similar project, and he was supporting them. . . . It is not his personal fear . . . [b]ut he saw the importance of this topic and was moved by it. So he began to help. This is how his compassion manifests itself—quietly, through action. (K. Kolosova (Friend from MSU), Ex. E.12 at 2).

**F.  Arrest, Acceptance, Incarceration and the Future**

On the night of October 8, 2024, it was Aleksei who needed help. That morning, Portuguese authorities arrested him on his way to volleyball practice. When he was arraigned, the judge informed him that the U.S. prosecutors were seeking forty years—the maximum of each of the two counts alleged. In his cell, Aleksei began contemplating suicide.

With Yulia's help, he made it through the first few weeks of jail, and by the end of October, he had hired counsel. The prison guards were on strike, which limited attorney visiting hours (and left Aleksei and the other inmates confined to their cells 22-hours a day), but by early December, he had instructed me to contact the prosecutor and begin the discussions that resulted in his not contesting extradition and pleading guilty at the earliest opportunity after arriving in the U.S.

Aleksei's acceptance of responsibility has been extraordinary. When I first met him, he did not understand why he had been arrested and was convinced that he and Gotbit had done nothing wrong. He was living in a cold, moldy, tiny cell—he could touch both walls—and he desperately wanted to understand why. I explained to him that fraud is lying to obtain something of value, that volume creation was a lie—creating the beneficial misimpression that a currency was more actively traded than it was—and thus when people spent money based at least in part on this false impression, they were defrauded. We ran through his objections—e.g., every market maker did it; wash trading didn't raise prices; the Degens knew all about it—but by the end of my first trip to Portugal, Aleksei said, "I understand. We did this. We committed fraud."

His acceptance never wavered. And in the eight months he has served—partially in a Portuguese prison that would pass muster *nowhere* in the U.S., and partially at the "amazing" (to quote Aleksei) Wyatt (but during a period in which, as Your Honor knows, he experienced long-untreated nerve pain)—he has worked hard on himself, grown and established entirely new

goals. Aleksei's letter best explains his journey of the last eight months and the future he sees for himself and Yulia, but witnessing his approach to this case has been a singular experience in my 20-plus years of criminal practice.

Aleksei has not only refused to engage in denial or self-pity, but to the extent possible, has seized the time jail has given him. To take one example, in Portugal, his local lawyer and friends provided him with endless stacks of double-sided, tiny-font printouts of various great works of Russian literature. Aleksei explained that his schooling was so focused on math and physics that he had a gap in his education and that it was "incredible" reading these authors. When I expressed interest, he created a prison reading list for me to share with my other clients.[15] It detailed what he'd read together with a sentence of commentary and a rating—a document that speaks volumes about him and is attached at Exhibit D. When I saw that he'd read *The Brothers Karamazov*, I mentioned that my daughter was reading it at college. That was a bit of a waste, he said, "you can only truly understand Dostoevsky if you read him in Russian, in jail."

Upon arrival at Wyatt, and with access to the tablets that allow for up to five hours of daily video calls with his family, he spends the time as follows: an hour mentoring his ▮▮▮▮ ▮ brother, helping with homework and advising him on nutrition and training; an hour with mother and grandmothers; and the rest of the time with Yulia, talking and watching online university lectures and taking quizzes about them together.[16]

---

[15] Among other qualities, Aleksei is very optimistic.

[16] So far, they have watched more than 25 lectures together on topics including the French Revolution, 19th century world history, 20th century world history, U.S. history, the Cold War, the history of the USSR, the reign of Peter the Great, and the Napoleonic Wars.

Aleksei has also focused on his mistakes and how he needs to change. There is the most obvious: being more cautious and, if ever he starts another business, consulting with older and more broadly experienced lawyers.[17] But there is also the deeper work. Aleksei's letter explores how his family's background and his childhood created feelings in him that drove him to succeed: to prove something to the rich kids who mocked him for taking the trolley bus to school, and to create stability and take care of Yulia and his family to make up for what he lacked. And also how his deep fear of repeating his father's footsteps and losing what he had gained drove him to workaholism—a shortcoming that deprived him of what he cares about most: his life with Yulia.

So, as he looks toward the rest of his life—and at 26, there is hopefully a lot to look forward to, including much-wanted children—he does so with the knowledge that his time in prison, no matter how hard, has not been wasted. By losing Gotbit, he found himself living—and then free of—the fear of loss and failure that drove him. He realized that the achievements that matter most are the relationships he spends his days at Wyatt tending. True to form, Aleksei has worked hard and grown from this experience. He firmly believes that it has changed him for the better.

But he has also paid for his mistake harshly. Aleksei has spent eight months in jail, much of it very hard time, and nearly all of it separated by thousands of miles from Yulia and his family who, despite the distance, he still tries to protect.[18] He has sacrificed the company he

---

[17] Gotbit consulted lawyers, mostly about fundraising and tackling extortion threats—the cryptocurrency markets are not for the faint of heart—but also on compliance. It was their advice that led to Aleksei hiring the sanctions and anti-money laundering experts. But the lawyers were young, and based in Russia, and they did not see beyond their own borders or the questions their client asked.

[18] Aleksei has tried to shield his friends and loved ones from his suffering, but it has been evident to them:

spent his life building from the age of 18. And he has forfeited the entirety of Gotbit's $23 million in profits—his own money—despite the inability to quantify the loss. The punishment has been severe.

Looking forward, Aleksei is most eager to return to Yulia. Their separation has been its own severe punishment: it is their first time apart since they began living together at age 15. They are eager to start a family. And they discuss following through on their long-held dream of starting a coffee shop where they settle. Aleksei is also interested in exploring ways he can make a positive impact in AI, and of seeking to impact some of the problems of poverty and hopelessness he saw in Izmailovo and has unexpectedly re-encountered in jail. But for now, he's focused on putting this behind him, being free, and returning to his heart.

"I want to go to the mountains with Yulia," he writes. It is a simple goal, but it reflects profoundly on who he is, what he has learned, and where he is going.

---

- I heard in every conversation we had that he was truly on the verge of despair. He tried hard not to upset or scare me, trying to look more cheerful than he felt, but these were just attempts to protect his loved ones. (Y. Andryunina (wife), Ex. B.3 at 6).

- Even in those terrible conditions, he thought about the feelings and condition of people near and dear to him, although his own condition was getting worse every day: he stopped seeing his right eye for a while, migraines, constant dizziness and pressure swings, panic attacks, depressive episodes; he lost a lot of weight from stress. And despite all this, he managed to show resilience and courage just to avoid hurting us. (S. Strigo (personal assistant & friend), Ex. E.7 at 3).

- Aleksei hardly talks about his feelings, but I can see how he has changed. He has become more withdrawn, he speaks less, it's as if the inner fire that always drove the team has disappeared in him. Even in this state, he still cares about others. He's not used to asking for help - but he's always helped those around him. (Anonymous Gotbit Employee, Project Management, Ex. E.13 at 3).

## II.     TIME SERVED IS THE JUST AND APPROPRIATE SENTENCE

Courts must not presume a Guidelines sentence is reasonable, but rather "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 39 (2007); *Pepper v. United States*, 562 U.S. 476, 488 (2011) (courts must "ensure[] that the punishment will suit not merely the offense but the individual defendant"). As Your Honor is aware, 18 U.S.C. 3553(a)'s familiar dictates require courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the seriousness of the offense; the goals of deterrence, reduction of recidivism, and fostering rehabilitation; the kinds of sentences available; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

Here, each and every factor weighs heavily in favor of a sentence of time served. Together, they are overwhelming: time served is the just sentence for this defendant, for committing this crime, in these circumstances.

We respectfully request that Your Honor sentence Aleksei to time served and allow him to return to Yulia, his family, and his future.

### A.   <u>A Sentence Other Than Time Served Creates Unwarranted Sentencing Disparities</u>

Courts must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6)

At the time of his sentencing, the eight months Aleksei has served <u>exceeds</u> (i) the actual jail time a similarly situated American would serve if they were sentenced to the 15-month sentence the government recommends, (ii) the awarded *sentences*—i.e., not just the period of any term of incarceration that would ensue—for the overwhelming majority of similarly situated defendants, and (iii) the *sentences* of other similar and more serious cryptocurrency and white-

collar fraud defendants. Further, instead of a federal prison camp, Aleksei has served very hard time.

As such, due to its severity, Aleksei's sentence already constitutes a disparity with other defendants with no criminal history found guilty of similar conduct. Any sentence other than time served would worsen it.

### 1. Aleksei's Time Served Equals the Total Incarceration a Similarly Situated American Citizen Would Serve on the 15-Month Sentence the Government Recommends

As set forth in the fact section, Aleksei has been incarcerated since his arrest on October 8, 2024. He served over four months in a Portuguese prison in Lisbon before waiving extradition and being moved to the Donald W. Wyatt Detention Facility ("Wyatt") where he has been held for the past three and a half months. In total, Aleksei will have served eight months and four days at the time of sentencing. As noted, this amount is equal to the time a similarly situated American citizen would actually serve in jail after being sentenced to the 15 months the government recommends.

The reason for this begins with bail. If Aleksei were American, his home, any property, his family and friends—his life—would be in the U.S. Given his lack of any criminal history, the extraordinary discipline he has shown over the course of his life, his ability to post security and—most relevantly—the conduct alleged and the potential sentence, it is inconceivable that Aleksei would not have been released on bail were he a U.S. citizen.

After achieving bail, an American in Aleksei's situation would report directly to a Federal Bureau of Prisons ("BOP") facility to serve any term of incarceration and, relevantly, begin accruing First Step Act (FSA) credits from his very first day there. *See* 18 U.S.C.

§ 3632(d)(4)(C). Aleksei, who has served all his time in Portugal and Wyatt, still remains ineligible for FSA credits.[19]

Further, were Aleksei American, he would become eligible for release to halfway house or home confinement long before his actual release date. *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (noting that convicted alien would serve "harsher time because [he would] not [be] eligible for halfway house placement").

When these two factors are added to the standard 15% good time reduction, an American who committed this identical crime would end up serving no more than eight months of a 15-month sentence.[20]

There is no reason why Aleksei—by dint of his foreign nationality alone—should serve more time than an identically situated U.S. citizen. *See United States v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205 (D. N.M. 2005) ("[I]t is solely because of Defendant's status as a deportable alien that he faces a unwarranted increase in the severity of his sentence . . . . These consequences are severe and unfair."). Moreover, as noted above, the time Aleksei has served has been far harder than that an American would serve at a federal prison camp. He spent the first four months in brutal conditions in Portugal, locked down 22-hours a day in a tiny, mold-covered cell with no heat, surrounded by violent felons in a prison so harsh that despite its small

---

[19] Inmates are only eligible for FSA credits upon reporting to their designated Bureau of Prisons facility. *See* Federal Bureau of Prisons, "First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)," Change Notice No. 5410.01 CN-1 (Feb. 6, 2023), https://www.bop.gov/policy/progstat/5410.01_cn2.pdf.

[20] Aleksei would be eligible for and invariably receive home confinement after serving eight months of a 15-month sentence in a federal prison camp were he American. Good Conduct Time credits would reduce his 15-month sentence by 15% to just under 13 months. His eight months served would reduce that number to just under five months, and the FSA credits he would receive for that time would reduce it by another three months, bringing his total remaining sentence to just under two months – a situation that would invariably result in his release to home confinement.

size (~130 inmates), two deaths occurred in the time Aleksei spent there: one suicide and one resulting from an untreated liver condition.[21] He then spent the three-plus months in Wyatt, which he reports is "amazing" by comparison, but for the majority of that time, as Your Honor is aware, he suffered from an untreated nerve problem that caused him agonizing pain.[22]

The fact that additional jail time would create an unwarranted disparity solely due to Aleksei's status as a deportable alien renders a sentence of time served the just result.

### 2. Aleksei Has *Served* More Time Than the *Sentences Received* by the Vast Majority of Equivalent Defendants

Setting aside his status as an alien, at the time of his sentencing Aleksei will have *served* more time than the *sentences received*—i.e., not yet served and therefore not reduced by good time and FSA credits and early release—by the overwhelming majority of similarly situated defendants.

As set forth in the Presentence Investigation Report ("PSR"), over the past five years 994 defendants have shared Aleksei's primary guideline range. *See* PSR ¶ 139. Of them, 378 (38%) received non-incarceratory sentences. *See Id.*, p. 31. And for the remaining 616 (62%) who did receive a term of incarceration, its median length was just six months. *Id.* As such, Aleksei has already *served* more time than the overwhelming majority of similarly situated defendants are

---

[21] My understanding is that not all prisons in Portugal are so brutal, but that given the Aleksei's wealth and the Portuguese authorities' misunderstanding that he would spend 45 years in U.S. prison, he was considered an extreme flight risk and placed in Lisbon's most severe, secure facility.

[22] In his letter, Aleksei thanks Your Honor for ordering that his nerve pain be examined. By way of update, as of the middle of May, Wyatt officials began prescribing medicine and pain killers that successfully addressed it, leaving only his dizziness remaining (an issue that is puzzling and therefore troubling, but far from acute). It appears that the root of Aleksei's pain was a nerve in a broken tooth that became infected and ultimately caused the inflammation to his ocular nerve visible in the MRI. After starting a course of antibiotics and receiving stronger pain medication, Aleksei has been essentially pain free (there is now just a quick shock of normal, localized, fleeting pain if something touches the affected tooth).

*sentenced to*—a huge existing sentencing disparity that, as discussed below, is in no way

warranted by either his history and characteristics, the nature and circumstances of the offense,

or any of the other 3553(A) factors. Because any further term of incarceration would worsen this

disparity, this factor also weighs heavily in favor of a sentence of time served.

### 3. Aleksei Has Already Served a Harsher Sentence Than Similarly Situated Defendants

Finally, other defendants in cryptocurrency cases specifically and white-collar fraud

cases more generally have been punished far less harshly than Aleksei for similar or more

serious conduct.

Most directly on point, in *United States v. CLS Global FZC LLC*, 1:24-cr-10293 (D.

Mass. 2025) ("*CLS Global*"), a case before Your Honor earlier this year, CLS pled guilty to the

*identical* conduct for which Aleksei will be sentenced: providing a wash trading service to meme

coin and utility token owners as part of the company's bundle of market making services. In that

case, no CLS executive was prosecuted and the company paid $428,059 and received a term of

three years' probation that permitted it to continue operating but stop providing volume creation

services to cryptocurrencies that trade on U.S. exchanges. *See United States v. CLS Global*, ECF

No. 32 ("Preliminary Order") (D. Mass. Mar. 26, 2025).

Notwithstanding the headline—no CLS executive was prosecuted—the company's fine

totaled less than 2% of the $23 million Aleksei and Gotbit forfeited. And in addition to

sacrificing this sum, Gotbit agreed to an order of probation that it "cease to exist or operate."

*United States v. Gotbit Consulting LLC*, No. 1:24-cr-10190, ECF Nos. 34-35 ("Plea

Agreements") (D. Mass. 2025).

This is an extraordinary sentencing disparity for identical conduct performed by a carbon-

copy of Gotbit. More jail time for Aleksei would compound the discrepancy.

Further, other non-cooperating cryptocurrency defendants who have engaged in similar or more serious conduct have received far lighter sentences. *See United States v. Zhao,* No. 2:23-cr-00179 (W.D. Wash. 2023) (founder of cryptocurrency exchange Binance sentenced to four months' incarceration for failure to implement an effective money-laundering program, which resulted in $898 million worth of trades that would not have otherwise occurred); *United States v. Michel,* No. 1:23-cr-00418 (E.D.N.Y. 2023) (defendant convicted of participating in a $2.9 million scheme to fraudulently market cryptocurrency tokens to investors sentenced to time served).

Aleksei has also *served* more time in prison than other non-cooperating defendants in this district were *sentenced to* following convictions for the willful commission of similar or more serious fraud charges. *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 41 n. 9, 50 (1st Cir. 2012) (affirming variance from Guidelines range of 87-108 months' to non-custodial sentence for nine years long fraud scheme where defendants knowingly provided substandard concrete to "Big Dig" construction project and created false documentation to cover it up); *United States v. Panousos*, No. 17-cr-10227 (D. Mass.) (varying from 18 to 24 month Guidelines range and imposing non-custodial sentences on three defendants who pled guilty to $1.5 million cash-skimming tax fraud scheme that was motivated by "greed and a desire to cheat the government to of the taxes they owed"); *United States v. Sales*, No. 17-cr-10110 (D. Mass.) (varying from 15 to 21 month Guidelines range and imposing non-custodial sentence on defendant who pled guilty to embezzling over $100,000 from an elderly bank customer which was used on personal expenses).[23]

---

[23] Similar cases outside this District include *United States v. Phillips*, No. 22-cr-00138, ECF No. 124 (S.D.N.Y. Jun. 28, 2024) (defendant charged with $20 million FX manipulation conspiracy sentenced to time served); *United States v. Black*, No. 16-cr-00370, ECF No. 456 (S.D.N.Y. Nov. 13, 2019) (defendant

Given the disproportionate severity of Aleksei's punishment to date compared with similar offenders, anything other than time served will, again, only serve to worsen the disparity.

### 4. As a Deportable Alien, Additional Punishment Would Be Disproportionately Harsh

As discussed above, Aleksei has already served more time than a similarly situated American defendant. He also faces additional detention because of his nationality: whenever Aleksei's term of imprisonment is completed, Immigration and Customs Enforcement (ICE) must take him into custody and deport him. *See* 8 U.S.C. § 1226(c)(ii) (requiring detention of criminal alien "when the alien is released [from prison], without regard to whether the alien is released on parole, supervised release, or probation"); *United States v. Hercules*, 947 F.3d 3, 9 (1st Cir. 2020) ("Under appropriate circumstances, a defendant's potential deportation may properly be considered as part of a broader assessment of his history and characteristics pursuant to section 3553(a)(1)"); *United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 732-733 (E.D. Va. 2005) (post-sentence immigration detention generally "mean[s] a further term of detention until [the defendant's] removal has been completed"). And although Aleksei would not challenge his removal, and we are currently trying to work with ICE to permit him to "self-deport"—i.e., be brought directly to an airport upon the termination of his term of imprisonment to board a pre-paid flight—it is impossible to predict (a) if this will take place and (b) if not, how much post-"release" time Aleksei will spend in ICE custody. Such a period of incarceration would of course

---

accused of engaging in a 6-year conspiracy to manipulate LIBOR with losses to counterparties estimated to exceed $4 million sentenced to time served); *United States v. Harkonen*, 08-cr-00164 (N.D. Ca. 2011) (varying from Guidelines range of 188 to 235 months and imposing non-custodial sentence on defendant convicted at trial for misrepresenting the results of a drug trial and causing over $20 million in losses to over 250 vulnerable victims); *United States v. Roth*, 2008 WL 686783, at *1-3 (N.D. Ill. Mar. 11, 2008) (varying from Guidelines range of 63 to 78 months and imposing non-custodial sentence on former in-house counsel who pled guilty to making false statements to the FBI and participating in scheme to defraud a hospital of $14.7 million).

extend whatever sentence the Court imposes, and could do so by a large percentage. *See, e.g.*, *Handa v. Clark*, 401 F.3d 1129, 1132 (9th Cir. 2015) (noting that five weeks transpired between arrest by ICE for visa overstay and removal to the UK). Moreover, the conditions in ICE detention facilities are also typically far worse than Bureau of Prisons facilities, further amplifying the punishment.[24]

  Aleksei's status as a non-citizen would also impact the conditions under which he would serve any additional sentence. Inviolable BOP policy requires all non-U.S. citizens to serve their sentences in a low, medium or high security facility. *See* BOP Program Statement 5100.08 at 50. Federal prison camps ("FPCs"), to which a U.S. offender like Aleksei would otherwise go,[25] are unavailable to him. This means that Aleksei will do much harder time than a U.S. citizen convicted of the same crime:

> Whereas FPCs are fenceless, low security prisons are surrounded by two perimeter barriers, each reinforced by multiple coils of razor wire, gun towers, and armed patrols. Inside, low security prisons employ extensive video surveillance and tightly control inmates' lives through, among other things, a minimum of five daily "counts" (including a count during the middle of the night), random pat downs, and strip-searches whenever they are removed from the facility for a visit or health appointment. These prisons also frequently undergo unpredictably long "lockdown" periods during which inmates are

---

[24] A January 2019 DHS inspector general report on ICE detention contractors found "serious deficiencies such as significant understaffing, failure to provide sufficient mental health observation, and inadequate monitoring of detainees with criminal histories." *Conditions in Migrant Detention Centres,* AMERICAN OVERSIGHT, (May 23, 2023), https://www.americanoversight.org/investigation/conditions-in-migrant-detention-centers. With the recent surge in deportation activity, ICE detention centers are becoming increasingly overcrowded, with worsening conditions for detainees. *See, e.g.*, WASHINGTON POST, *Immigrants forced to sleep on floors at overwhelmed ICE detention centers* (April 20, 2025), https://www.washingtonpost.com/business/2025/04/18/immigrant-detention-overcrowding-trump-crackdown/.

[25] If Aleksei were a U.S. citizen, there is little doubt that he would be sent to an FPC. Under the BOP designation guidelines, Aleksei's "security point score" would be well within the 0-to-11-point range that BOP indicates is appropriate for a minimum security FPC. *See* BOP Program Statement 5100.08.

confined to quarters and denied recreation, visitation and telephone
calls.

Compared with FPCs that typically house 100 to 400 inmates, low
security prisons usually have between 1,200 and 1,500 (and often
exceed their designed maximum capacity). The overcrowding in low
security prisons is extremely stressful for inmates and noise is
constant. The size of these institutions and the ratio of staff to inmates
virtually guarantee unsafe and unsanitary conditions (leading to
widespread infectious diseases and violence).

*See United States v. Conti*, No. 1:14-cr-00272-JSR-6, ECF No. 229 at 21 (S.D.N.Y.

2016) (defense sentencing memorandum contrasting FPCs with low security prisons).

Not only would the physical conditions in a low-security facility serve as additional

punishment, but many inmates at low-security prisons are serving lengthy sentences of 10 years

or more, have been convicted of violent crimes, are affiliated with gangs, and have a much

higher propensity for violence against other inmates. *See id.* at 22-23. Finally, further jail time in

the United States would also continue excessively punishing for Aleksei because he would

receive no visitors. None in his family have the B-2 visas required to enter the U.S., it can take

several months to obtain them in the best of times, and since the start of the war in Ukraine, it

has become virtually impossible.[26] As such, despite their extraordinary concern for him, none of

his family members will be able to attend his sentencing or visit him in prison if he is further

incarcerated. This immeasurably amplifies Aleksei's punishment, particularly with regard to his

wife.

Finally, Aleksei's conviction will also severely limit the countries to which he can apply

for residency, restrict his ability to travel, and very likely prohibit him from ever working in a

---

[26] U.S. Embassy & Consulates in Russia, Visas, https://ru.usembassy.gov/visas/ (last visited May 5,
2025); Travel.State.Gov, Global Visa Wait Times (May 25, 2025),
https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/global-visa-wait-times.html
(showing that no appointments are available for visas at U.S. embassies and consulates in Russia).

regulated industry—additional punishments that are properly considered in assessing the need

for additional punishment. *See United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014)

(courts can consider immigration consequences of conviction in determining an appropriate

sentence); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016)

(imposing non-Guidelines, non-incarceratory sentence "in part because of a number of statutory

and regulatory collateral consequences [defendant] will face as a convicted felon").

In sum, a similarly situated American citizen—even when sentenced to the upper end of

the Guidelines range of 18 months—would serve approximately six months in a relatively

comfortable prison camp. In comparison, Aleksei has already done eight months of hard time.

*See United States v. Redemann*, 295 F. Supp. 2d 887, 896 (E.D. Wis. 2003) (court should make

sentencing allowances for "defendant who faces more onerous conditions of confinement than

the typical defendant"). A sentence requiring any further incarceration would only worsen this

disparity.

## B.  Time Served is Warranted Given Aleksei's Personal History and Characteristics

As set forth in Section I and in the letters submitted to the Court on Aleksei's behalf by

the people who know him best, Aleksei has an extraordinarily close-knit network of family and

friends. He also has an extraordinarily stable, loving and generative relationship with his wife,

Yulia. Courts have found relationships like Aleksei and Yulia's to be a "case-specific" reason for

leniency. *See, e.g.*, *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming

downward departure where district court concluded that defendant had a "close-knit family

whose stability depend[ed] on [his] continued presence").

Aleksei's crime is also an aberration from what has otherwise been an exceptional life. As

detailed above, Aleksei is a responsible, honest, exceptionally hardworking, and otherwise law-

abiding person. He has no criminal history and routinely tried to do what was right over the course of both his personal and professional life. He was an inspirational leader and wonderful boss to those who worked at Gotbit, with his core values revealed by the devotion and care he showed for both clients and colleagues. And in his personal life, Aleksei has likewise been an exemplar, taking responsibility for and care of those around him, from supporting his and Yulia's relatives as a high school student to paying for a bone-marrow transplant for an acquaintance from childhood. He is committed to self-improvement, including while in prison where he has used his time to not only think about and grow from this experience, but also to further educate himself, immersing himself in literature and history. And he is resilient, a trait evident from his very first chess tournament at age 7, and one that has served him well in prison and will continue to do so upon his release.

These qualities—the ones that are seen again and again at every stage of Aleksei's short but extraordinary life—make Aleksei who he is, not the aberration that is the volume creation feature in Gotbit's algorithm.

Courts have departed from the Guidelines where the defendant's crimes were an aberration from their character and values, and we respectfully request that Your Honor do the same here. *See, e.g.*, *United States v. Nesbeth*, 188 F. Supp. 3d 179, 193 (E.D.N.Y. 2016) (imposing non-custodial sentence where defendants' crimes "were certainly a marked deviation from an exemplary law-abiding life"); *United States v. Mullings*, 131 F. Supp. 3d 1, 4-5 (E.D.N.Y. 2015) (imposing non-custodial sentence where court concluded that fraudulent conduct was aberrational and a custodial sentence would cause unnecessary detriment to defendant's wife and young children); *see also United States v. Germosen*, 473 F. Supp. 2d 221, 227-28 (D. Mass. 2007) ("aberrant behavior departure[s]…are available even though a course of criminal conduct involves more than one criminal act[.]").

Aleksei's youthfulness for the duration of Gotbit's volume creation also merits leniency. The Sentencing Guidelines specifically note that youthfulness may warrant a downward departure, recognizing that young people are "more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation." United States Sentencing Commission ("U.S.S.G."), Age Policy Statement, § 5H1.1 (2024); *see also* PSR ¶ 137 ("The Court may wish to consider the defendant's youthfulness at the time of the offense (ages 20-26), including his environment, adverse childhood experiences, and familial relationships.")

Aleksei first entered the cryptocurrency world as a teenager, working at the direction of a family friend. To the extent he should have asked more questions, probed more deeply, or been more cautious, it is clear that his youthfulness contributed to his excitement about Gotbit and blindness to the risks, mediating in favor of a downward departure. Impulsivity and lack of forethought is exactly what the Sentencing Guidelines contemplate in allowing for a downward departure on the basis of age. *See United States v. Yang*, No. 1:23-CR-0258-SDG, 2024 WL 5202493, at *5 (N.D. Ga. Dec. 20, 2024) ("Age, in other words, is an important mitigating factor here, and a strong reason to consider the sufficiency of 'a form of punishment other than imprisonment.'").

Finally, Aleksei's genuine and deep remorse for his conduct merit leniency. In his letter, Aleksei says that "[t]he process of accepting guilt was painful." Aleksei Andriunin Ltr., Ex. A at 11. And yet once he understood the fraud involved in volume creation, he forthrightly accepted responsibility, waived his right to contest his extradition, thus giving away his chance to avoid this case altogether and saving the government and Portuguese courts considerable time and effort, and

pled guilty at the earliest opportunity upon his arrival in Boston.[27] Since accepting responsibility for his actions, Aleksei is filled with regret. He speaks at length in his letter of his deep shame and apologizes both to all investor victims and to his family. And Aleksei's remorse is not just communicated in words. By promptly accepting such a harsh result for Gotbit—forfeiting nearly $23 million and agreeing to cease operations rather than fighting—he has shown contrition as well. *See, e.g.*, *United States v. Anderson*, No. 18-cr-71, 2021 WL 776975, at *8 (W.D.N.Y. Mar. 1, 2021) (court granted nine month variance based on "Defendant's demonstrated remorse, pre-sentence rehabilitation, and family ties and responsibilities"); *United States v. Ramos*, No. 12-cr-556, 2020 WL 7128967, at *2 (S.D.N.Y. Dec. 4, 2020) (court granted downward departure to mandatory minimum sentence based in part on defendant's genuine remorse and "deep regret" for his actions); *United States v. Mack*, No. 17-cr-138, 2020 WL 6161255, at *1 (E.D.N.Y. Oct. 21, 2020) (court granted 15-month downward departure based on defendant's remorse and participation in reentry rehabilitation programs).

Who Aleksei has been, who he is, and who he will go one to be all argue compellingly for a sentence of time served.

### C. The Nature and Circumstances of the Offense Merit a Sentence of Time Served

Aleksei did not set out to commit fraud. He thought he ran a clean, lawful, respectable company. Indeed, he was so sure of it that he stored the company's funds in a cryptocurrency wallet whose address was listed on Gotbit's website and, when they were frozen, rather than flee, he stayed put in Lisbon for 24 days and directed his team to contact the FBI and find out what the

---

[27] Aleksei waived his right to contest extradition prior to the Portuguese court's review of its propriety. I understand from his Portuguese extradition counsel that this brought forward by approximately six months the date by which he would be extradited were opposition to extradition to fail.

trouble was.[28] It was not until speaking with counsel, in jail, that Aleksei first understood that volume creation could be considered fraud. He never decided to break the law, and he never knew that he was. It is an extraordinary fact, and one the government does not contest.

Gotbit was a real business that offered a number of legitimate market-making services in addition to volume creation. The company had numerous departments and teams separate from volume creation. Its eight-person Human Resources department had its pick of an endless line of MSU's best graduates, all hoping to follow in Aleksei's footsteps. And Gotbit was known for delivering best-in-class client service—on the few occasions Aleksei caught employees cheating clients, he summarily fired them and made the clients whole. Indeed, in the exploding, unregulated and fraud-filled cryptocurrency markets, he thought that a clean reputation was the keystone of Gotbit's success.

Aleksei's perception that he and Gotbit had done nothing wrong made sense from his perspective. At 18, he engaged in volume creation for the first time at the direction of his boss—a family friend—in order to recreate the services their start-up needed to obtain an exchange listing for its utility token. He discovered that that volume creation was an integral part of how currencies were launched and was ubiquitously employed across the unregulated cryptocurrency markets. Indeed, it was effectively a prerequisite for listing a currency on an exchange—the context in which he first encountered it. He then built Gotbit without realizing that volume creation was illegal. And throughout the company's life, nothing in his world sent him the signal that it was -- he looked out at his industry and saw that Gotbit provided the same services, including volume creation, as his competitors (albeit with better customer service).

---

[28] The email from Gotbit's team to the FBI is attached as Exhibit C.

Aleksei pled guilty because he is guilty—there were doubtless unwitting buyers of cryptocurrencies that appeared more attractive due to false volume who later sold them at a lower price after volume creation ceased. But while at 19 Aleksei understood that volume creation was "questionable," providing it did not require him to abandon his values or engage in moral gymnastics to conclude that it was not causing any harm.

There are a number of reasons why. The first lies in the ubiquity of volume creation on cryptocurrency markets. By definition, products for sale on a market contain no inherent "true price"—their value is exclusively determined by the market in relation to the other similar products on offer. Given that volume creation was effectively a prerequisite to obtaining and maintaining a listing on an exchange, and that every currency Gotbit wash traded for its clients was priced in relation to other currencies, the overwhelming majority of which were also wash traded, determining the quantum of the benefit wash trading provided to any currency (or, perhaps more accurately, the elimination of the detriment of having a non-wash traded currency) is exceedingly difficult to measure and hard to perceive.

Second, whatever the profits of volume creation may have been, they did not accrue to Gotbit. Gotbit charged clients for providing volume creation among its many services, but the payment for it was not an approximation of either the gain to the clients from the benefit to their currencies or of the loss to anyone who bought and later sold them after volume creation ceased. Gotbit was not stuffing its coffers with victim losses.

Third, volume creation did not spike the prices of the currencies to which it was applied. As discussed, since the wash trades took place at the currency's current price with the client's own funds, it could not ward off a drop in price or create a rise—those effects would require real buying and selling, not circular trading with oneself.

Finally, and most importantly, it is very, very difficult to discern the harms from volume creation to victims. As noted, the victims here are the investors in a given cryptocurrency who experienced a loss when selling a currency previously supported by wash trading that dropped in price following its removal. But the Degens formed the overwhelming majority of traders on the market and, to them, volume creation is well known. Someone who is aware that they are being lied to cannot, of course, be defrauded by the lie, so the typical Degen—the person Aleksei had in his mind when he thought about those trading his clients' currencies—was not a victim. And while it is doubtlessly true that over the course of Gotbit's existence, there were investor victims who did not know about volume creation, it is also true that Aleksei did not have to ignore harm to victims while committing the crime.

In sum, Aleksei and Gotbit's conduct was in the heartland of the industry's status quo and he didn't think he was harming anyone or committing a crime, as demonstrated by a litany of facts ranging from writing to the FBI rather than fleeing upon the freezing of Gotbit's accounts to his hiring of anti-money laundering and sanctions evasions experts to keep Gotbit on the right side of the law.

This creates a critical distinction between his criminal and his moral culpability—a distinction that is central to determining a just sentence. *See, e.g., Graham v. Florida,* 560 U.S. 48, 71 (2010) ("[A] criminal sentence must be directly related to the personal culpability of the criminal offender."); *see also Abdul-Kabir v. Quarterman,* 550 U.S. 233, 251-53 (2007) ("[T]he sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime.") (emphasis in original). It not only argues strongly in favor of a sentence of time served, but also shows the exceptional nature of Aleksei's acceptance of responsibility for his conduct and the harshness of the punishment he has endured for it.

### D. **Aleksei's Punishment Adequately Deters Others and Promotes Respect for the Law**

It is uncontested that prison time is unnecessary to "protect the public from [future] crimes" by Aleksei. 18 U.S.C. § 3553(a)(2)(C). He has no prior criminal history, he has been punished harshly, he did not understand he was committing an offense, and there is no reason to believe that he will ever commit another. To cement things, Aleksei also agreed to give up Gotbit and work in the cryptocurrency markets. *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (no risk of recidivism where offense was "particularly adapted to [the defendant's] chosen career[,]" "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated"). Specific deterrence was satisfied the day Aleksei realized volume creation was a crime.

As to general deterrence, the message has been sent loud a clear: volume creation is illegal, and if you engage in it, you will go to jail, lose your company, and all its funds. This case has been heavily publicized in the cryptocurrency industry, with a number of major industry websites following each development and providing regular updates to their readers.[29] Market makers the world over already knew about Gotbit and its dynamic founder. They now all know that volume creation is illegal and if they keep engaging in it, they will be punished harshly. No additional jail time is necessary: a strong and loud general deterrence message has been sent.

---

[29] *See, e.g.*, CoinDesk: *Gotbit Founder Aleksei Andriunin Pleads Guilty to Wire Fraud, Market Manipulation* (Mar. 20, 2025), https://www.coindesk.com/policy/2025/03/20/gotbit-founder-aleksei-andriunin-pleads-guilty-to-wire-fraud-market-manipulation; CoinMarketCap: *Gotbit Founder Indicted on Federal Charges in Market Manipulation Scheme*, https://coinmarketcap.com/academy/article/gotbit-founder-indicted-on-federal-charges-in-market-manipulation-scheme (last visited June 5, 2025); Bitcoin.com: *DOJ Seeks Forfeiture of $23 Million in Crypto After Gotbit Guilty Plea* (Mar. 28, 2025), https://news.bitcoin.com/doj-seeks-forfeiture-of-23-million-in-crypto-after-gotbit-guilty-plea/; The Crypto Times: *Who is Aleksei Andriunin, Russian founder of Gotbit, who is extradited to the US?* (Feb. 27, 2025), https://www.cryptotimes.io/2025/02/27/who-is-aleksei-andriunin-of-gotbit-who-is-extradited-to-us/.

### E.  Aleksei's Forfeiture More Than Satisfies Any Fine and Restitution Is Not Applicable

Aleksei forfeited nearly $23 million of Gotbit's funds—his funds—to the government as part of his and Gotbit's plea agreements. The statutory maximum for each Count Aleksei pleaded guilty to is $250,000, for a maximum total fine of $750,000. 18 U.S.C. § 3571(b); PSR ¶ 130. Aleksei's forfeiture is over 30 times greater than that. And as the PSR states regarding restitution, "individual dispersed market participants have not been identified and any restitution that may be owed cannot reasonably be estimated…[and] it is not applicable." See PSR ¶¶ 134-35. As such, we respectfully submit that no further financial penalty is warranted.

**CONCLUSION**

Aleksei has deep remorse for his mistake and accepted responsibility for it. He has been severely punished already and, for the reasons discussed herein, we respectfully submit that given his personal history, adding an incarceratory sentence of any length would be "greater than necessary to serve the purposes of sentencing," *Gall*, 552 U.S. at 44, counterproductive, and needlessly harmful. We respectfully request a sentence of time served. *See Mullings*, 131 F. Supp. 3d at 4 ("In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized.").

Date: June 5, 2025                                    Respectfully submitted,

                                                      */s/ Roger A. Burlingame*

                                                      Roger A. Burlingame
                                                      R. Ryan Dykhouse
                                                      Sumridhi Kaur