UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:24-CR-10190-AK |
| ALEKSEI ANDRIUNIN, | |
| Defendant | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The government respectfully submits this memorandum in connection with the sentencing of defendant Aleksei Andriunin, scheduled for June 12, 2025. For the reasons set forth below, the government respectfully requests that the Court impose a sentence of imprisonment of 15 months.

**I.        Background**

Andriunin was a student at Moscow State University when he first applied his talents in mathematics to cryptocurrency trading. He went on to build a successful company—Gotbit Consulting LLC ("Gotbit")—that became a premier "market maker" in the cryptocurrency industry, employed over 200 individuals, and boasted hundreds of cryptocurrency customers. By 2024, Gotbit made tens of millions of dollars in annual revenue.

From its inception, however, Gotbit provided customers with a core, fraudulent service: wash trading cryptocurrencies to create the illusion of active trading volume. In a 2019 interview (posted to YouTube)[1], Andriunin explained how he founded Gotbit after creating a "trading system" to artificially inflate trading volume for cryptocurrencies with the purpose of getting those cryptocurrencies noticed on CoinMarketCap (a website that highlights "trending"

---

[1] "Meet the Russian man whose job it is to fake token activity (Full Interview)" (Aug. 30, 2019), https://www.youtube.com/watch?v=I-Um62NPm0A.

cryptocurrencies) and listed on larger cryptocurrency exchanges. His algorithm entered buy and sell orders simultaneously from multiple accounts to create fake trading volume and conceal the source of this activity.

While Gotbit grew and expanded its services, it continued to provide illegal volume creation for clients, some of whose cryptocurrencies traded on platforms available to investors in the United States. These clients included the Robo Inu and Saitama tokens, whose developers were charged in related fraud cases. *See United States v. Vy Pham*, 24-CR-10137-AK; *United States v. Maxwell Hernandez*, 23-CR-10135-AK; *United States v. Russell Armand*, 24-CR-10014-AK; *United States v. Manpreet Kohli et al.*, 24-CR-10189-AK. Clients hired Gotbit to artificially boost their tokens' trading volumes for the purpose of stimulating real demand and listing on bigger exchanges, where more users could purchase the tokens and drive up token prices.

At all times, Andriunin led Gotbit, promoted it at events and on social media, and recruited and managed its employees. Business development managers and traders worked directly with cryptocurrency clients to create artificial volume, but Andriunin oversaw all operations, and his name was on the contracts under which Gotbit generated fake volume for clients.

Based on this fraudulent volume manipulation, Andriunin, Gotbit, and two of Gotbit's employees were charged with one count of conspiracy to commit wire fraud and market manipulation (in violation of 18 U.S.C. § 371) and two counts of wire fraud (in violation of 18 U.S.C. § 1343). Andriunin was arrested in Portugal in October 2024. Following his extradition to the United States in February 2025, he pleaded guilty pursuant to a plea agreement and tendered a guilty plea by Gotbit under a separate plea agreement. He has remained detained since his arrest (approximately 8 months).

II.    **Sentencing Guidelines and Plea Agreement**

The parties and the U.S. Probation Office agree that, pursuant to the calculation set forth below, Andriunin's total offense level under the Sentencing Guidelines is 13, yielding an advisory sentencing range of 12 to 18 months:

- Base offense level of seven (USSG § 2B1.1(a)(1));

- Increase of two because the offenses involved 10 or more victims (USSG § 2B1.1(b)(2)(A)(i));

- Increase of three (to 12)[2] because a substantial part of the fraudulent scheme was committed from outside the United States, and the offenses otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG § 2B1.1(b)(10)(B) and (C));

- Increase of four because the defendant was an organizer or leader of a criminal activity that involved five or more participants and was otherwise extensive (USSG § 3B1.1(a)); and

- Decrease of three for acceptance of responsibility (USSG § 3E1.1).

PSR ¶¶ 71-81.

This calculation does not include an enhancement based on loss amount. The plea agreement contains the following relevant acknowledgment:

> The parties agree that the fraudulent scheme caused loss as defined under USSG § 2B1.1(b)(1). Specifically, the scheme caused reasonably foreseeable pecuniary harm to dispersed market participants who purchased cryptocurrencies at fraudulently inflated prices and lost money after those prices later dropped, once the prices of those cryptocurrencies were no longer artificially inflated. However, neither these losses nor the gain that resulted from the offense can reasonably be

_____

[2] The PSR correctly applies the guideline's instruction to "increase to level 12" if the offense level is less than level 12. The plea agreement and the PSR reach the same total offense level after applying the decrease for acceptance of responsibility.

> estimated based on available information for the purpose of applying an increase to Defendant's offense level under USSG §2B1.1(b)(1). See App. Note 3(C). The U.S. Attorney therefore reserves the right to argue that the offense level "substantially understates the seriousness of the offense" such that "an upward departure may be warranted." App. Note 21.

Plea Agreement ¶ 3.

Under the plea agreement, the government agreed to recommend a sentence of up to, but no greater than 24 months, and Andriunin agreed to consent to the forfeiture of cryptocurrency belonging to Gotbit with a value of approximately $23 million through a separate civil forfeiture action. *Id.* ¶¶ 4, 6.

## III.    Sentence Recommendation

The government respectfully submits that the sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence of 15 months.

### *Nature and Circumstances of the Offense*

The nature and circumstances of Andriunin's offenses are serious. As the head of a rising tech company, he participated in a conspiracy and a scheme to defraud cryptocurrency market participants by providing market manipulation as a service.

Andriunin pitched Gotbit as a business that could help newer and smaller cryptocurrency projects take off. One challenge that fledgling projects faced was generating the trading volumes required for listing on exchanges, where users could then buy and sell their tokens. Exchanges set minimum daily trading requirements, generally because greater trading activity attracted more users, which in turn generated revenue for the exchanges through trading fees. From its inception,

Gotbit assisted clients with listing on exchanges by satisfying these minimum volume requirements through fake trading activity.[3]

New cryptocurrency projects also needed to generate organic demand so that real traders would buy their tokens and drive up prices. Projects used Gotbit to create artificial volume that made it look like their tokens were attracting attention and worth purchasing. For example, one of the Robo Inu token's promoters instructed Gotbit to "slowly increase the volume" to get the token "trending on cmc" (CoinMarketCap). Cryptocurrencies that featured on this influential market data site caught the eyes of traders who otherwise may never have learned of those tokens. Gotbit provided this service from its beginning, as well.[4]

The purpose of Gotbit's volume creation was deception. Many of the exchanges that set volume quotas were aware that Gotbit and other market makers were executing wash trades so that tokens met those requirements. Some exchanges provided Gotbit with accounts with reduced trading fees to use for wash trading. But these exchanges also purported to prohibit deceptive trading and otherwise held themselves out as fair and transparent platforms. While the exchanges may have known better, there is little indication that traders on the exchange knew that they were purchasing tokens that were propped up by Gotbit's fake trading algorithm.

So too with traders who purchased tokens that trended on CoinMarketCap (or similar sites) because Gotbit artificially boosted the tokens' trading volumes. The goal was to deceive traders

---

[3] *See*, *e.g.*, CoinDesk, "For $15K, He'll Fake Your Exchange Volume – You'll Get on CoinMarketCap" (July 18, 2019), https://www.coindesk.com/markets/2019/07/18/for-15k-hell-fake-your-exchange-volume-youll-get-on-coinmarketcap ("His partner codes the trading bots while Andryunin reaches out to token projects to sell Gotbit's 'market-making' services. Listing on a small exchange costs $8,000; a month of supporting fake trading volumes via algorithms imitating normal market activities will run you $6,000.").

[4] *Id.* ("Getting the token on CoinMarketCap is a bit steeper at $15,000.").

into buying the tokens. When Robo Inu asked for a volume increase to get "trending on cmc," a Gotbit trader answered, "Yeah we can increase more volume gradually but it is important that our market looks organic." Another Gotbit employee later explained that "this has to be done because CMC itself can detect suspicious activity in the market and exclude volumes from" the exchange on which Gotbit was wash trading. There is little reason to believe that CoinMarketCap's millions of users were savvy enough to understand that certain tokens that trended only did so because their developers' paid Gotbit thousands of dollars to have an algorithm juice their trading activity. In fact, Gotbit's efforts to make the trading activity look "organic" proves that most users did not appreciate this fact.

While Gotbit grew and expanded its services, volume creation remained a core offering, as reflected by the prominence of volume creation in Gotbit's standard market making agreements with clients. Regardless of whether Gotbit inflated a client's trading volume to meet an exchange's requirement or to create "hype and fomo" (in the words of the Robo Inu promoter), the result was the same: traders purchased cryptocurrencies that appeared to be in greater demand and of greater value than they really were. Those traders were victims of fraud.

Gotbit was not the direct beneficiary of its wash trading. Unlike its clients, who held tokens themselves and stood to gain from price increases and trading fees, Gotbit generally did not promote, sell, or earn trading fees from the tokens that it propped up. But Gotbit was integral to the fraud and made money from providing a service that, at its core, was valuable only because it deceived traders into buying clients' tokens. Andriunin started Gotbit from this illegal service and continued to make money from it until he was arrested in 2024.

Wash trading distorts markets and causes harm to real investors. When a cryptocurrency's volume or price is artificially inflated, investors are misled about that asset's liquidity and value.

Those traders make investment decisions based on a false picture of market activity. They then lose money when a token's price is no longer artificially supported and when the market for the token is revealed to be thinner than they believed. More broadly, wash trading erodes trust in the markets and deters legitimate participation by real investors. Sophisticated wash trading of the kind Gotbit conducted is difficult to detect and complicates efforts to promote fair trading.

As the parties' plea agreement acknowledges, this fraud caused real but dispersed losses that cannot readily be quantified for purposes of applying a loss amount adjustment. Gotbit received tens of millions of dollars in cryptocurrency from clients—$23 million of which the government seized before Andriunin's arrest. Gotbit's revenues from wash trading cannot cleanly be disentangled from payments it received for lawful services, and those revenues do not clearly correlate to investor losses. It therefore is reasonable in this case to forego a loss adjustment, with the understanding that the Guidelines calculation understates Andriunin's culpability for the offense in this respect.

Andriunin set Gotbit into motion, made it a leading market maker, and profited handsomely from it. His company offered a service that defrauded traders in violation of U.S. law. The victims of this fraud were dispersed; most victims likely remain unaware that they were affected by Gotbit's manipulation of cryptocurrencies that they traded. But these offenses caused real harm to investors and to the integrity of cryptocurrency markets.

### History and Personal Characteristics

Andriunin is a talented and driven individual. Growing up in Russia, he surmounted various economic, family, and health hardships. He committed himself to excelling at chess, volleyball, and mathematics. He supported family members and friends, who are clearly devoted to him.

It is unsurprising that someone of Andriunin's background, talents, and drive would see opportunity in cryptocurrency markets. In an expanding and largely unregulated space, Andriunin found a market for assisting others with launching new cryptocurrencies. This venture drew on his programming abilities, mathematical acuity, and people skills. It offered the possibility of making life-changing amounts of money at a young age and over a short period of time. It turned into ownership of a profitable, well-known business with global reach.

From the beginning, Andriunin understood that wash trading was wrong. His public comments from 2019 reflect this. In interviews with CoinDesk, he described wash trading as "not entirely ethical" and as a "questionable service" (adding, "I'd rather it didn't exist."). However, he defended the outcome of helping projects get listed on exchanges and noticed on CoinMarketCap. Asked about the legality of his business, he insisted that, since Gotbit never worked with projects whose tokens U.S. residents could buy, Gotbit did not violate U.S. law. He repeated: "I think it's a questionable practice, but not a crime."

Andriunin built a business on these incorrect judgments. He failed to acknowledge that investors lost money when a project that he made appear to be successful ultimately failed. He also allowed his company to wash trade for U.S.-based projects with tokens available to U.S. investors.

Since agreeing to face charges in the United States and to plead guilty, Andriunin has accepted responsibility for his actions and expressed remorse. He also has accepted responsibility on behalf of his company, consented to the forfeiture of a significant portion of his company's earnings, and agreed (through Gotbit's plea agreement) not to resuscitate Gotbit's business at any time during a five-year period of probation. Andriunin has unequivocally acknowledged that he knows what he did was wrong and understands the harm from his conduct, as demonstrated by his sentencing submissions to the Court.

### *Need for Deterrence and Respect for the Law*

Countless young, ambitious individuals like Andriunin seek profit in cryptocurrency markets. Despite their novelty and laxer rules, these markets are not lawless. In the United States, it is unlawful to defraud others, in cryptocurrency markets as in all things. The sentence in this case should deter similar fraud schemes and promote respect for the law.

There is an evident need to deter cryptocurrency market manipulation. A 2023 academic study examined wash trading on centralized cryptocurrency exchanges and concluded that over 70% of the volume reported by those exchanges was fake.[5] The charges against Andriunin and Gotbit were unsealed alongside charges against three other market makers—two companies similar to Gotbit (and associated individuals) and one individual who provided cryptocurrency projects with a trading "bot" for controlling their own artificial volume generation. *See United States v. CLS Global FZC LLC et al.*, 24-cr-10293-AK; *United States v. ZM Quant Investment LTD et al.*, 24-cr-10187-AK; *United States v. Liu Zhou*, 24-cr-10312-AK. Crypto wash trading is prevalent, and market makers profit from undertaking it.

Wash trading is difficult to detect. The blockchain analysis firm Chainalysis explains:

> Financial regulators around the world face challenges in identifying wash trading in traditional markets because collusion strategies vary and collusive transactions can be masked among normal trading activities. These challenges often take different forms in the crypto space, where pseudonymity, the use of decentralized platforms, and a lack of comprehensive regulatory oversight add complexity.

Chainalysis, *The 2025 Crypto Crime Report* (Feb. 2025), https://go.chainalysis.com/2025-Crypto-Crime-Report.html. The FBI uncovered Gotbit's wash trading in connection with its investigation

---

[5] Cong, L. W., Li, X., Tang, K., and Yang, Y., *Crypto Wash Trading*, 69 Management Science 6427 (Sept. 2023).

into Gotbit's clients and through a subsequent sting operation. Where wash trading is detected and prosecuted, it calls for a sentence that warns others not to bet that they will get away with it.

At the same time, Andriunin's response to the charges in this case point to a genuine acceptance of responsibility. For that reason, while a sentence of incarceration is appropriate here—to reflect the seriousness of the offense and ensure adequate general deterrence—specific deterrence is of far less concern.

## V.     Conclusion

For these reasons, the government respectfully requests that the Court impose a sentence of 15 months incarceration, which is a sentence that is appropriate and no greater than necessary to accomplish the goals of sentencing with respect to this defendant.

Respectfully submitted this 5th day of June 2025,

LEAH B. FOLEY
United States Attorney

By:     /s/  *David M. Holcomb*
DAVID M. HOLCOMB
Assistant United States Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3000

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ *David M. Holcomb*</u>
David M. Holcomb
Assistant United States Attorney

Date: June 5, 2025